UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD BRINK,<br><br>     Plaintiff,<br><br>v.<br><br>DR. ALI TERAB PARHIZ, Vitreo-retinal Surgeon-Idaho Retina Center; DR. LANDON K. GRANGE, at Vison Quest Medical Center; and DR. JAROD MONG, Director of Ophthalmology-Vision Quest Medical Center/Proprietor;<br><br>     Defendants. | Case No. 1:22-cv-00413-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendant Dr. Ali Terab Parhiz's Motion for Summary Judgment. Dkt. 41. Having reviewed the parties' submissions and considered their arguments, the Court enters the following Order granting Dr. Parhiz summary judgment. The Court also reviews the status of Plaintiff's claims against Dr. Landon Grange and Dr. Jarod Mong.

**REVIEW OF MOTION FOR SUMMARY JUDGMENT**

## 1. Standards of Law

Summary judgment is appropriate when a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might

MEMORANDUM DECISION AND ORDER - 1

affect the outcome of the suit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show material facts are not in dispute, a party may cite to particular parts of the record or assert that the adverse party is unable to produce admissible evidence to support material fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider the parties' citations to the record, but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

To state a claim under 42 U.S.C. § 1983, the civil rights statute, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To state a § 1983 Eighth Amendment claim, a plaintiff must allege facts meeting both an objective standard (the deprivation was serious enough to constitute cruel and unusual punishment) and a subjective standard (a mindset of deliberate indifference). *See Hudson v. McMillian*, 503 U.S. 1, 5, 8-9 (1992).

"Deliberate indifference" means that a prison official acted in a way that exhibits something "more than ordinary lack of due care for the prisoner's interests or safety," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result," such as reckless conduct that can be equated with a desire to inflict harm. *See Farmer*, 511 U.S. 835-38.   Stated another way, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference." *Id.* at 838.

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Medical negligence, medical  malpractice, or even gross negligence will not support a claim for relief under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980); *Daniels v. Williams*, 474 U.S. 327 (1986) (negligence is not actionable under § 1983 because such actions are not an abuse of governmental power, but rather a "failure to measure up to the conduct of a reasonable person.").

There is no per se rule that expert testimony is necessary to establish an Eighth Amendment claim of deliberate indifference to a serious medical need. Instead, the question is whether, in the context of a particular case, the plaintiff has produced sufficient evidence—of whatever kind—to create a genuine dispute of material fact about each of the required elements: a serious medical need and a deliberately indifferent state of mind. *Phoenix v. Amonette*, 95 F.4th 852, 858–59 (4th Cir. 2024). Whether expert testimony is necessary depends on the nature and complexity of the medical issues in a particular case and what other evidence is available in the record.

A § 1983 claim involving a sophisticated medical condition often requires that expert testimony be offered to prove causation. *Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006). In *Phoenix*, *supra*, the Fourth Circuit Court of Appeals reasoned:

> [D]etermining whether medical professionals responded reasonably to a particular risk can involve an examination of the relevant standard of care. If, for example,

an incarcerated person sues a doctor because they think the doctor chose the wrong course of treatment in a particular situation, *showing the right course of treatment* will be a necessary step in proving the doctor failed to respond reasonably. As a practical matter, that often may require testimony from a physician because lay jurors may "not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 536 (3d Cir. 2017).

95 F.4th at 859 (emphasis added).

On the other hand, in *Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016), the court determined no expert was needed to prove a deliberate indifference claim where the "jury [was] capable of understanding, unaided, the risks of failing to provide insulin to a diabetic." *Id*. at 230. Therefore, on the issues of causation and adequacy of the medical care—which are part of the objective inquiry—the question may turn on whether the jury can comprehend the material issues without expert testimony. *Pearson*, 850 F.3d at 535.

As to the subjective inquiry, it is essential to note the mere provision of inadequate medical care does not itself amount to deliberate indifference—the defendant must act with the requisite state of mind when providing inadequate care. *Id*. This element of an Eighth Amendment claim usually is proven through circumstantial evidence and defendant and eyewitness testimony. *Id*.

In assessing evidence at summary judgment, the Court does not determine the credibility of affiants or weigh the evidence. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir.

MEMORANDUM DECISION AND ORDER - 4

1988).

"To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). Nor may a plaintiff "create a genuine issue of fact simply by proffering conclusory allegations that witnesses are lying." *McKenzie v. Jorizzo*, No. 1:13-CV-1302-44, 2015 WL 127826, at *5 (D. Or. Jan. 6, 2015), *aff'd*, 668 F. App'x 738 (9th Cir. 2016). *See also Johnson v. Queens Admin. for Children's Servs*., No. 02–4497, 2006 WL 229905, at *5 (E.D.N.Y. Jan. 31, 2006) ("Plaintiff does not contradict CPS Williams' account that notice was given to Marion Johnson other than by his conclusory allegation that Williams was lying, which is insufficient to create a genuine issue of fact that plaintiff's procedural due process rights were violated.")

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

### 2. Sua Sponte Consideration of Whether an Attorney for Plaintiff or a Neutral Court Expert for the Court is Needed

The subject matter of this case is complex: it regards vitreoretinal surgery, a subspecialty of ophthalmology, as well as a patient who had several coexisting right eye problems in addition to the right eye retinal detachment that is the subject of this lawsuit. After reviewing the parties' arguments and evidentiary submissions on Defendant's

Motion for Summary Judgment, but before ruling on the motion, the Court considers whether it should appoint counsel for Plaintiff or a neutral expert for the Court.

The court may appoint counsel for indigent civil litigants under "exceptional circumstances." *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009). In determining whether "exceptional circumstances" exist, the court must consider "the likelihood of success on the merits" and "the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved." *Id*. (citing *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983)). In *Terrell v. Brewer*, 935 F.2d 1015 (9th Cir. 1991), the appeals court affirmed the trial court's denial of appointment of counsel for a *pro se* prisoner in an Eighth Amendment deliberate indifference medical case, finding that, although the subject matter was somewhat complex, "[t]he compelling evidence against Terrell made it extremely unlikely that he would succeed on the merits." *Id*. at 1017. *See also Goldstein v. Flament,* 167 F. App'x 678, 681 (9th Cir. 2006) (unpubl.) ("Goldstein produced a voluminous record but simply did not present meritorious claims" to warrant appointment of counsel). Only "rarely" will a federal court find a case to be so complex that it is appropriate to appoint counsel for a civil litigant who faces no loss of liberty in the controversy at hand. *Williams v. Navarro*, No. 3:18-cv-01318-DMS-RBM, 2021 WL 634752, at *2 (S.D. Cal. Feb. 17, 2021).

As to appointment of an expert, Federal Rule of Evidence 706 provides for court-appointed experts in complex litigation where the record is not clearly developed by the parties, and appointment would aid the court in understanding the subject matter at hand. *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir.

1999) (finding appointment of a physician expert witness appropriate where medical testimony on record was "not particularly clear" because of disagreement among several doctors); *In re Joint E. & S. Districts Asbestos Litig.*, 830 F. Supp. 686, 693 (E.D. N.Y. 1993) (noting that court appointment of experts is appropriate only in "rare circumstances" and should be reserved for "exceptional cases" in which the ordinary adversarial process does not suffice, such as complex mass tort problems).

Rule 706 may not be invoked simply to "appoint an expert on behalf of an indigent civil party." *Woodroffe v. Oregon*, 2014 WL 1383400, at *5 (D. Or. April 8, 2014); *see also Gorton v. Todd*, 793 F. Supp. 2d 1171, 1178 n.6, 1184 n.11 (E.D. Cal. 2011) (Rule 706 did not permit the appointment of a neutral expert witness solely for an indigent prisoners' "own benefit" in aiming to prove deliberate indifference).

Here, even though the subject matter of this case is complex, several eye specialists unaffiliated with Dr. Parhiz were involved in Plaintiff's care, and there is no evidence of disagreement among them that would point to a disputed fact as to the objective prong of the Eighth Amendment test; the totality of the medical records provides sufficient factual information to aid in determining whether Dr. Parhiz responded reasonably to Plaintiff's issues. The Court provided Plaintiff with opportunity to ask his treating eye specialist or another doctor for further opinions, but they apparently declined to do so.

It is undisputed that Plaintiff had a serious medical need. Therefore, this case turns on whether Plaintiff can point to evidence showing that Dr. Parhiz acted with deliberate indifference. That question generally does not require expert testimony.

The Court concludes it is not necessary to appoint counsel for Plaintiff or a neutral

MEMORANDUM DECISION AND ORDER - 7

expert for the Court. Plaintiff has not crossed the threshold of proffering a "scintilla of evidence" to show that Dr. Parhiz was deliberately indifferent to his serious medical condition. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A "scintilla" means "only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stiffler v. O'Malley*, 102 F.4th 1102, 1106 (9th Cir. 2024) (citations omitted). Therefore, as the Court will now explain, summary judgment for Dr. Parhiz is warranted, and no further litigation will be entertained. The Court will enter judgment under Rule 54(b) for Dr. Parhiz, rather than waiting for disposition of the other claims against the other medical providers.

### 3. State Actor Requirement

The Court ordered the parties to brief the question of whether Dr. Parhiz was a state actor (1) when he initially performed surgery on Plaintiff's eye the morning after Plaintiff arrived in the hospital emergency room; and (2) when he continued to provide follow-up care to Plaintiff after the hospitalization.

#### A. *Initial Treatment in ER*

Dr. Parhiz has provided evidence that Plaintiff's initial emergency room evaluation, the first surgery, and the first in-office evaluation were part of his free services donated to indigent patients presenting themselves in the emergency rooms of Treasure Valley hospitals, and that these services were not associated with a contract with the Idaho Department of Correction (IDOC) or the IDOC-contracted medical provider, Corizon.

Generally, doctors are not considered state actors if they work in an emergency room where they are obligated to provide medical services to anyone and everyone in the general

public. *See Sykes v. McPhillips*, 412 F.Supp.2d 197, 203 (N.D.N.Y. 2006). It does not matter, as Plaintiff argues, that the hospital, ER doctors, and specialist doctors *later* send bills out to indigent patients—the material factor is that the doctors providing emergency care are not permitted to decide beforehand that they will not treat patients until or unless patients provide proof of ability to pay for emergency medical services before receiving care.

Here, even if Dr. Parhiz stated, "I don't treat prisoners," as Plaintiff alleges, the fact of the matter is that Dr. Parhiz *did* treat Plaintiff in an emergency medical setting, without a prior expectation of payment.[1] There is no evidence in the record that, before the surgery, Dr. Parhiz called Corizon to contract with it to be paid, as Plaintiff speculates. During the ER visit, Dr. Parhiz gave Plaintiff two options: for Dr. Parhiz to perform the surgery the next morning in Idaho, or for Plaintiff to be transported to the University of Utah for the surgery at some point when prison transportation could be arranged. Plaintiff elected to have Dr. Parhiz perform the surgery. Up to this point, Dr. Parhiz was not a state actor.

There is no clear answer from prior case law on the state actor question from the time period of surgery forward because of the unique facts of this case. On the one hand, Dr. Parhiz agreed to assume the responsibility to treat a person in custody of the state, as a state actor would. On the other hand, Plaintiff had a choice of which provider to use, which is contrary to one of the reasons medical providers who treat prisoners are deemed state

---

[1] Plaintiff asserts that Dr. Parhiz eventually billed the prison's medical care provider, Corizon, after the surgeries and office visits. Dr. Parhiz states that, at one point in time, following his care and treatment of Plaintiff, his office did submit a request for reimbursement for services already rendered, but at no point in time did he ever expect payment for the services provided to Plaintiff (Dkt. 50 at 2). A doctor may bill an insurance provider, or a functional equivalent, such as Corizon, without becoming a state actor.

actors—that the prisoner has no provider choices of their own, because the prison medical unit selects the providers.

The Court concludes that, although Plaintiff chose Dr. Parhiz to perform the surgery, Plaintiff's range of choices was circumscribed by his custody (for example, he could not have chosen to have a relative drive him to Utah quicker than the prison could, because he must use prison transportation and abide by prison administrative timing). Because Dr. Parhiz agreed to treat a prisoner, he (knowingly or not) agreed to stand in the place of the State as to its obligation to provide adequate medical care to Plaintiff *and* because Plaintiff's choice of providers was limited by his custody, the Court concludes that Dr. Parhiz was a state actor from only the first surgery forward. *See Maggio v. Shelton*, 2015 WL 5126567 (D. Or. 2015) (collecting cases regarding emergency room medical care).

### B. *Subsequent Treatment*

Dr. Parhiz performed follow-up care and an additional outpatient surgical procedure on Plaintiff after the initial surgery. Plaintiff alleges that, after the surgery, Dr. Parhiz concealed the torn lens and failed to repair it. The facts in this case are similar to those in *Maggio*:

> Based on the facts alleged by Plaintiff, Dr. Anderson had more than an "incidental and transitory relationship" with Plaintiff. Indeed, Dr. Anderson agreed to provide medical care to Plaintiff, a state prisoner. As alleged by Plaintiff, Dr. Anderson treats many prisoners who are referred to him by ODOC. Plaintiff saw Dr. Anderson on four separate occasions: once for the initial referral, again for the surgery, again for the pin removal, and once again after Plaintiff complained about pain lasting for months after the procedure. The fact that Plaintiff was sent back to Dr. Anderson by TRCI staff on multiple occasions, even after Plaintiff complained about the

> medical treatment he received from Dr. Anderson, suggests that Dr. Anderson "voluntarily" accepted TRCI's delegation of its duty to provide Plaintiff's medical care. Considering the relationship between TRCI, ODOC, Plaintiff, and Dr. Anderson, the Court concludes that Plaintiff sufficiently alleges that Dr. Anderson effectively engaged in a public function by providing medical care to Plaintiff, a person involuntarily in the custody of the state.

*Id*. at *7 (footnote omitted).

Here, there is no evidence that the IDOC referred *other* patients to Dr. Parhiz, but it *did* refer Plaintiff to Dr. Parhiz multiple times, and Dr. Parhiz performed an additional surgery and rendered continuing care to Plaintiff. On these facts, the Court concludes that Dr. Parhiz is a state actor for that time period. *See Carl v. Muskegon Cnty.*, 763 F.3d 592, 596 (6th Cir. 2014) (collecting cases) (courts have held that private physicians and medical entities are state actors for purposes of § 1983 when a state has delegated its obligation to provide medical care to inmates); *see also Conner v. Donnelly*, 42 F.3d 220, 225–26 (4th Cir. 1994) (private doctor who treated an inmate was deemed a state actor even though he had no contract with the prison).

### 4. Discussion of Eighth Amendment Claims

Dr. Parhiz has construed Plaintiff's Amended Complaint as stating 10 subclaims. Dkt. 41-1 at 8. The Court has addressed subclaim 3 above (whether Dr. Parhiz was a state actor). The Court will address the medical subclaims in related groups. As noted above, Plaintiff's serious medical need is not disputed; therefore, this case turns on whether Plaintiff can point to evidence showing that Dr. Parhiz acted with deliberate indifference. Because the Court has determined that Dr. Parhiz was not a state actor for the initial

consultation in the ER unit, the following discussion as to that time frame is relevant only as an alternative decision of the Court on the state of mind element of Plaintiff's claims.

> ### A. *Emergency Room Visit and Original Surgery on September 12-13, 2020: Delay, Refusal to Operate, Postponement of Original Surgery, Delay of Original Surgery*

In subclaims (1), (4), (5), and (8), Plaintiff asserts: (1) Dr. Parhiz delayed the provision of ophthalmic care when Plaintiff was suffering from a detached retina (Dkt. 10 at 2); (4) Dr. Parhiz refused to operate on Plaintiff's right eye (Dkt. 10 at 5); (5) Dr. Parhiz postponed Plaintiff's eye surgery for approximately 28 hours (*id*.); and (8) Dr. Parhiz delayed surgery for the purpose of obtaining additional profit by waiting for the prison medical provider to agree to pay for the surgery (Dkt. 10 at 5). All of these claims arise from the time frame between Plaintiff's Emergency Room (ER) visit and the original surgery on September 12-13, 2020.

Plaintiff's medical history before suffering the right eye retinal detachment included glaucoma, macular degeneration, a right eye cataract, and left eye retinal detachment. Dkt. 41-4 at 11, 15, 19. He had previously seen Dr. Scott Simpson, the prison medical provider's contracted retinal specialist, for treatment of his left eye. *Id*. After the left eye retinal re-attachment surgery by Dr. Simpson (eight years before Plaintiff's right eye retinal re-attachment surgery by Dr. Parhiz), Plaintiff had "extensive proliferative vitreoretinopathy in the left eye, leaving "the visual potential of that eye quite limited." Dkt. 35 at 2. As a result, Plaintiff wore a left eye patch and completely relied upon his right eye for sight. *Id*. at 19.

On September 12, 2020, Petitioner suffered what appeared to be a right retinal

detachment, and prison officials transported him to the St. Alphonsus ER. Dr. Andrew Southard, who is not a defendant, examined Plaintiff and determined he had a possible detached retina. Dr. Southard called Dr. Parhiz, the ophthalmologist who donated his time to be on call for three Boise hospitals on that date. Dr. Parhiz, who was treating another patient at a different hospital when he received the call, asked Dr. Southard to call Dr. Simpson to see if he could perform surgery on Plaintiff. Dr. Parhiz thought this was the best solution, because Dr. Simpson was familiar with Plaintiff's medical history and could provide follow-up care. Dr. Parhiz did not usually treat prisoners because of security and space issues at his regular office and because he did not have a contract with Corizon. Dkt. 41-3, at 3. "Dr. Simpson [was] consulted and [] declined this patient as they recommended urgent surgical consult which will most likely preserve the patient's vision to the highest point; they are unable to perform emergent attachment." Dkt. 41-4 at 16.

When Dr. Simpson declined to treat Plaintiff's emergency condition, Dr. Parhiz asked the ER doctor to begin working on a patient transfer to the University of Utah medical center, which was a routine course of action for Boise patients who presented with retinal detachments after hours or on weekends. Dr. Parhiz was aware that St. Alphonsus did not have adequate retina-trained staff to aid him in performing eye surgery on that date. Dkt. 41-3 at 3.

Upon arriving at St. Alphonsus, Dr. Parhiz examined Plaintiff and confirmed a retinal detachment that necessitated surgery. *Id*. at 4. Dr. Parhiz explained to the ER doctor that Plaintiff needed surgery, but that Dr. Parhiz did not have the ability to perform the surgery at St. Alphonsus safely that evening, due to the lack of retina-trained staff. Dr.

MEMORANDUM DECISION AND ORDER - 13

Parhiz also expressed his concern about properly following up with Plaintiff after surgery, given Plaintiff's incarceration and Dr. Parhiz's lack of a contract with Corizon. *Id*. The ER doctor informed Dr. Parhiz that follow-up care could be even more problematic for Plaintiff if he was transferred to the University of Utah, as there were often great difficulties involved in the transport of prisoners. *Id*.

Dr. Parhiz had a discussion with the operating room manager about necessary staffing for the surgery. Dr. Parhiz was informed that trained staff would be available the following day. *Id*. at 5. The medical record of Dr. Keith Scott supports the history provided by Dr. Parhiz. *See* Dkts. 41-4 at 19, 52-2.

Dr. Parhiz spoke with Plaintiff regarding options available to him. He explained to Plaintiff that he needed surgery, and that he could not safely perform the needed surgery on that day. Dr. Parhiz informed him that retina-trained staff would be available the next morning. He informed Plaintiff that he could choose whether to stay and have surgery the next day at St. Alphonsus, or be transferred to the University of Utah. Dr. Parhiz then discussed the risks, benefits, and alternatives with Plaintiff, including risks of bleeding, infection, retinal tear, retinal detachment, glaucoma, cataracts, floaters, droopy lids, pain, vision loss, and the need for more surgery. He explained to Plaintiff that he would need cataract surgery shortly after his retinal detachment surgery, as the nature of the retinal re-attachment surgery would cause rapid progression of cataracts. After this discussion, Plaintiff elected to stay at St. Alphonsus to have Dr. Parhiz perform the surgery the next morning. Dkt. 41-3 at 5 & Ex. A.

Plaintiff was admitted to St. Alphonsus Hospital. Dr. Parhiz's next-day surgery on

Plaintiff's right eye consisted of a "repair of retinal detachment with gas and laser through vitrectomy." Dkt. 41-4 at 11, 23.

Plaintiff's version of the course of events leading to his first right eye surgery is based in speculation. That Dr. Parhiz said he doesn't treat prisoners is a simple fact that is properly explained by the foregoing evidence; Plaintiff's speculation that the statement was prompted by profit, discrimination, or ill will is unsupported. The fact that Plaintiff's hospital intake records show "Corizon" as Plaintiff's "insurance" does not show that the reason Plaintiff's surgery was delayed was "for profit," as he alleges. *See* Dkt. 52, 52-1, 52-2. The delay in the provision of ophthalmic care was due to Dr. Simpson declining to perform the after-hours surgery, the hospital being understaffed for the type of surgery needed, and Dr. Parhiz's concern for Plaintiff's health: a good outcome could not have been achieved the night Plaintiff was admitted to the hospital due to understaffing. No deliberate indifference is shown by this record. Dr. Parhiz offered to treat Plaintiff when he learned that it would be quicker for Plaintiff than the Utah option, even though Dr. Parhiz usually did not treat prisoners and he realized the follow-up care would place a burden on his own office. Dr. Parhiz conscientiously and "deliberately" delayed surgery, not with indifference, but for Plaintiff's health and safety. For these reasons, Dr. Parhiz is entitled to summary judgment on Subclaims 1, 4, 5, and 8, and they will be dismissed with prejudice.

### B. *Shattering Lens, Ignoring Concerns about Lens, False Diagnosis, Oil*

Subclaims 2, 6, and 7 focus on Plaintiff's reports of vision problems in the weeks following the original surgery. Plaintiff asserts: (2) Dr. Parhiz left "shattered lens pieces in

Plaintiff's right eye" and failed to disclose that problem (Dkt. 10 at 2); (6) Dr. Parhiz "ignored Plaintiff's concerns about lens debris and shadows" (Dkt. 10 at 6); and (7) Dr. Parhiz failed to "remove the damaged and broken lens pieces from Plaintiff's eye" or inform Plaintiff about that problem (*id.*). Plaintiff also asserts that Dr. Parhiz falsified the need for cataract surgery to cover up the broken lens problem, and that Dr. Parhiz should not have left silicone oil in his eye after the second surgery.

i.   <u>Alleged Shattered Lens</u>

Plaintiff uses his own observations to assert that he had a shattered lens and that it was caused by Dr. Parhiz. However, these causal connections and conclusions require expert testimony, because they are not within a layperson's body of knowledge. As noted above, it is not necessary to appoint an expert, because (1) all of the doctors agree that the broken lens was present only after a later cataract surgery performed by Defendant Dr. Landon Grange, and (2) Plaintiff was presented with an opportunity to obtain an expert opinion to controvert those in the record, and he did not.

Plaintiff declares that he "clearly informed Defendant Parhiz about broken lens on four (4) separate office visits; by stating black squares; with jagged edges blocking his vision; that resembled black lens fragments; like floaters that move with the eye." Dkt. 54 at 3. Plaintiff then leaps to the conclusion that what he saw and described necessarily meant his lens had been shattered by Dr. Parhiz during surgery, and to the further conclusion that Dr. Parhiz knew that a mistake had occurred but chose to conceal it during the rest of Plaintiff's treatment. Plaintiff says Dr. Parhiz's medical records of September 23, 2020, show "[m]ultiple black floaters (small dots) states notice [sic] them after Sx OD." Dkt. 41-

3 at 20. The medical records also reflect that, on October 5, 2020, Plaintiff reported a "curtain or shadow at the top left of the eye which moved up and down with Plaintiff's vision." Dkt. 60-2 at 11; 60-5 at 12. Dr. Parhiz wrote: "His central vision he sees rigid lines for past week." Dkt. 41-3 at 24.

Plaintiff asserts that Dr. Parhiz failed to record that Plaintiff also reported that he saw a curtain obstructing his vision on the *bottom part* of the eye and that Plaintiff reported a broken lens with *jagged edges*. *Id*. Plaintiff points to a note in the record—where Dr. Parhiz wrote that Plaintiff remarked he was "seeing black dots"—to draw a conclusion that Dr. Parhiz had shattered Plaintiff's lens in the first surgery. Plaintiff says that, after Plaintiff reported the black dots, Dr. Parhiz asked him to read the letter board. When Plaintiff attempted the test, Dr. Parhiz noted, "Patient needed to move around to see letters." Dkt. 54 at 4. Plaintiff asserts—without any medical expertise—that the fact that he had to move to enhance his ability to see the letters was "due to broken lens pieces overlapping and blocking my vision." Dkt. 52-1 at 8.

Without adequate foundation, Plaintiff asserts Vision Quest records show that, between Dr. Parhiz's retinal surgery and Dr. Grange's cataract surgery, Plaintiff's lens was broken. He points to Dr. Grange's notation of "Lens: nuclear: 3-4+, 3+ PSC", and "presumes" this is evidence that the lens was broken before the cataract surgery. *See* Dkt. 54 at 5; Dkt. 41-4 at 83. The Court takes judicial notice that these are merely standard notations for diagnosing and grading cataracts.[2] Plaintiff cannot create a genuine dispute

---

[2] *See, e.g.*, https://eyeguru.org/essentials/cataract-grading/.

over a material fact based on mere speculation.

Plaintiff ignores the fact that, even if he reported to Dr. Parhiz that he was sure he had a broken lens, that the curtain or shadow in his eye was at the top *and* bottom, and that he saw *jagged edges* in his vision, Plaintiff has no expertise to confirm that these symptoms meant he had a broken lens rather than a cataract, symptoms of glaucoma, or other problem.

Plaintiff asserts that Dr. Parhiz *ignored* the condition based on the response that "I explained to the patient that the current lenticular changes are not visually significant." *Id*. Plaintiff attempts to craft his own definition of *lenticular*, despite its common meaning of "relating to the lens of the eye." [3] Plaintiff claims that Dr. Parhiz failed to inform Corizon "about the broken lenticular changes," Dkt. 53 at 6, but neither the medical records nor the common definition of lenticular support Plaintiff's speculation that a lenticular change necessarily meant a broken lens. Plaintiff provides no contrary medical evidence that the lenticular change was, in fact, visually significant.

On the contrary, this statement shows that Dr. Parhiz assessed Plaintiff's reports, examined his eye, and made a medical determination; nothing in the record shows this process equates to deliberate indifference. Plaintiff was provided with opportunity to submit another expert's opinion, but he did not do so. His own speculation, embellishments of the medical records, and attempts to self-diagnose provide no basis for a dispute of facts here.

Plaintiff also asserts that various other medical providers mis-recorded his

---

[3] See Oxford Languages Dictionary online at https://languages.oup.com/google-dictionary-en/.

comments about seeing shapes that, to him, appeared to be a broken lens. Plaintiff states that he reported to a nurse that he was seeing "block [sic] spots." Dkt. 52-1 at 4. Nurse Wendy Gregersen recorded Plaintiff as complaining of blurry vision and black spots. Dkt. 41-4 at 38. On September 21, 2020, Dr. Jamie Recasens, the prison medical doctor, recorded that Plaintiff reported he had "full right field of vision but 'sees some black spots,'" Dkt. 41-4 at 40. Contrarily, Plaintiff says that he reported seeing "lens fragments" to Dr. Recasens, not black spots. Dkt. 41-3, Ex. C. On September 29, 2020, nurse Jeanne English recorded that Plaintiff reported seeing "dark spots."

Even if the Court assumes the truth of Plaintiffs allegations that multiple medical providers often wrote down his verbal reports differently from the way he reported them, he lacks the medical expertise to show that his self-diagnosis is accurate. Nothing among all other medical records shows that Dr. Parhiz acted contrary to the medical standard of care for vitreoretinal surgery. Nor is there any evidence in the record that Dr. Parhiz acted with deliberate indifference. Rather, the record shows Dr. Parhiz made several diagnoses and recommendations for after-surgery care, rather than ignore Plaintiff.

Dr. Simpson's records contain information contrary to Plaintiff's claims against Dr. Parhiz, regarding causation of the lens fragmentation:

> At the time of cataract surgery [performed by Dr. Grange], he developed some retained lens fragments and was left aphakic. I started seeing him again in December 2021. He required surgery in January to remove the … retained lens fragment.

Dkt. 35 at 10-1.

Dr. Simpson's records also show:

Mr. Brink has a history of a retinal detachment in his right eye. He initially had surgery in August 2020 and subsequently required a secondary surgery about a month later. He was left with the eye full of silicone oil. He subsequently had cataract surgery in May 2021. At the time of surgery there were some complications, and he was left aphakic[4].... He has emulsified silicone oil in the anterior chamber as well as some in the vitreous cavity. There are retained lens fragments in the eye. He is also aphakic. Initially what we need to do is remove the silicone oil and emulsification as well as the retained lens fragments....

*Id.* at 2.

Plaintiff's speculative evidence does not overcome the fact that all doctors' medical records supports Dr. Parhiz's position that the lens was not broken during the initial retinal reattachment surgery by Dr. Parhiz.

ii.   Cataract Surgery Recommendation

Plaintiff asserts that Dr. Parhiz acted with deliberate indifference when he advised Plaintiff to obtain cataract surgery as a treatment option. Plaintiff asserts that he continued to inform Dr. Parhiz on subsequent visits that he had broken lens fragments in his eye, but Dr. Parhiz continued to recommend cataract surgery rather than take another course of action in response to Plaintiff's complaints.

It is important to note that "the nature of retinal re-attachment surgery causes rapid progression of cataracts." Dkt. 41-2 at 5. The record contains many references to Plaintiff's right eye cataracts from prison medical providers and outside providers, not

---

[4] The Court notes the following general definition: "Aphakia is a condition in which you're missing the lens of one or both of your eyes. You can be born that way or lose the lens due to an injury. Or your doctor might remove it during an operation for cataracts. When you have aphakia, it's hard to see things clearly with the affected eye. But doctors can correct it with surgery, special glasses, or contact lenses." https://www.webmd.com/eye-health/aphakia-overview (accessed 4/6/2024).

MEMORANDUM DECISION AND ORDER - 20

limited to Dr. Parhiz. Therefore, other medical records support Dr. Parhiz's position that Plaintiff needed cataract surgery, and that recommendation was not simply a guise to detract from a broken lens.

The "Condensed Consultation Request" from February 25, 2021, written by Richard Murray, the prison optometrist, contains the following:

Per provider notes on 2/24/21

> Patient didn't follow up, as instructed, with retina doctor (Dr. Palz?) [sic] following surgery for retinal detachment. OD cataract is now so dense patient doesn't not [sic] have functional vision. Patient desperately needs cataract Sx OD, patient also needs to follow up with the surgeon who performed his retinal detachment [sic] Sx. Patient would also like to have his OS enucleated due to chronic pain. Very important to proceed with cataract Sx. The patient is very frustrated, please communicate plans.

Dkt. 41-4 at 75; Dkt. 52-4 at 26. On the same date, Dr. Murray noted that Plaintiff suffered from the following: primary open-angle glaucoma, mild stage; other age-related incipient cataract, right eye, combined forms of age-related cataract, right eye; dry eye syndrome of unspecified lacrimal gland, unspecified retinal detachment with retinal break, right eye." Dkt. 41-4 at 76.

Similarly, Dr. Grange's records of March 20, 2021 show evidence of a "[n]uclear cataract: right eye, very symptomatic, rapidly worsening" and "[i]nsipient cataract: right eye." Dkt. 41-4 at 87. Further, Dr. Grange noted, "The patient is clearly visually handicapped by the cataract in the right eye and would benefit from cataract surgery." *Id*. at 89. On March 26, 2021, Plaintiff, in fact had cataract surgery, performed by Dr. Grange, confirming that Dr. Parhiz was correct in determining that Plaintiff needed cataract surgery.

Again, there is no objective or subjective evidence that would support an Eighth Amendment claim regarding Dr. Parhiz's recommendation that Plaintiff needed cataract surgery in his right eye.

        iii.    <u>Silicone Oil Eye Lubricant</u>

Plaintiff asserts that it was deliberate indifference for Dr. Parhiz to leave silicone oil in his eye after the surgery. However, the very purpose of silicone oil is to aid in healing. Dr. Parhiz's consent form for retinal detachment repair indicates: "If there is a large amount of scar tissue, and the doctor feels that a longer pushing action than a gas bubble provides [5-6 weeks] will be needed, silicone oil may be used. Silicone oil is a very clear, thick fluid that remains in the eye for as long as the doctor feels necessary, but is typically removed within 3-6 months." Dkt. 41-3 at 27.

Plaintiff has not offered any competent medical opinion that Dr. Parhiz's use of silicone oil, or leaving the oil in Plaintiff's eye after Plaintiff's second retinal detachment, was medically unacceptable under the circumstances and that Dr. Parhiz chose this course in conscious disregard of an excessive risk to Plaintiff's health. Importantly, Plaintiff did not follow up with Dr. Parhiz after October 19, 2020 (due to his own or the prison's failure to schedule additional appointments); thus, it would have been impossible for Dr. Parhiz to have removed the silicone oil from Plaintiff's eye.

Dr. Simpson's records also support Dr Parhiz's position. Dr. Simpson noted that Plaintiff "developed complications secondary to the silicone oil in both eyes." Dkt. 35 at 21. Nothing in the record suggests that the complications were due to Dr. Parhiz not following the proper standard of care. Dr. Simpson further noted that he, himself, used

MEMORANDUM DECISION AND ORDER - 22

silicone oil when he performed retinal surgery on Plaintiff's left eye prior to Dr. Parhiz's

surgery:

> Mr. Brink has a history of retinal detachment in both eyes. The right eye was repaired by Dr. Parhiz in 2020. By history this required multiple surgeries and required placement of silicone oil. I repaired the left eye in 2011. This also required multiple surgeries and required placement of silicone oil.

*Id.*, p. 24.

The evidence in the record shows that leaving silicone oil (intended to promote healing) in a patient's eye after retinal re-attachment surgery is a discretionary matter based on multiple factors. Further, even if leaving the silicone oil in Plaintiff's right eye was a decision not measuring up to community standards, nothing in the record suggests that Dr. Parhiz *recognized* that leaving silicone oil in Plaintiff's eye for an extended period of time after surgery would injure the eye and *chose to ignore* that risk in the face of that knowledge, or that Dr. Parhiz had any control over the fact that Plaintiff never returned for additional follow-up care. Rather, the record shows that leaving the silicone oil in Plaintiff's eye was due a decision to promote healing. The record shows that an unanticipated complication with the oil arose at a later date during the cataract procedure performed by Dr. Grange of Vision Quest, allegedly supervised by Dr. Jarod Mong, also of Vision Quest. Dr. Parhiz had nothing to do with the cataract surgery, and Vision Quest is a separate business from Dr. Parhiz's practice. *See* Dkt. 50 at 2.

At most, Plaintiff possibly could state a state-law negligence claim, but negligence does not meet the standard for a federal deliberate indifference claim (and nothing in this Order should be construed as suggesting or determining that Dr. Parhiz was negligent).

### C. *Purposefully Causing Blindness, Delay in other Remedial Surgery*

Subclaims 9 and 10 focus on Plaintiff's continuing problems during follow-up care, through his second surgery by Dr. Parhiz, and his cataract surgery by Dr. Grange. Plaintiff asserts: (9) Dr. Parhiz caused additional delay in treatment (Dkt. 10 at 8), and (10) Dr. Parhiz acted in a manner to "ensure Plaintiff remained permanently blind" (Dkt. 10 at 11). The time frame for these allegations is the same as those claims discussed above in this Order, and, thus, there is some overlap in the discussion.

Plaintiff's "purposeful" delay claim is based on the following allegations:

> Defendant Parhiz never admitted to his actions, never referred to the broken lens in his post-op reports, that caused severe delay in treatment which resulted in unnecessary vision loss, pain and suffering." Also, "[b]ecause there was no urgent notification in Defendant Parhiz's reports or records, the institution did not expedite further consultations or examinations, and as a result of this delay in getting to see any form of an Optical specialist, it took nine (9) months to get an appointment with a Cataract surgeon, Dr. Grange, who was unaware of the shattered lens embedded in Plaintiff's right eye due to Defendant Parhiz's failure to include the broken lens in his medical reports nor remove the broken lens from Plaintiff's right eye.

Dkt. 10 at 8.

On September 23, 2020, Plaintiff had a first post-operative examination by Dr. Parhiz and afterward reported to the prison infirmary nurse that Plaintiff's eye surgery "gas bubble is still there but diminishing," and he had "[s]ome scar tissue present as well." Dkt. 41-4 at 61. Dr. Parhiz told Plaintiff another surgery would likely be required. Dkt. 41-3 at 6.

Plaintiff now asserts that Dr. Parhiz gave a "false" explanation to Plaintiff: that what

Plaintiff was seeing was "laser debris" and/or distortion due to the gas bubble in his eye, not a broken lens. Dkt. 52-1 at 5. A layperson cannot create a genuine dispute as to a material fact that requires expertise in ophthalmology and vitreoretinal surgery simply by arguing with the doctor's opinion. He has not produced a contrary medical opinion, and the other doctors' opinions in the record are not to the contrary.

On October 4, 2020, a Sunday, Plaintiff's fiancée or wife made complaints via a telephone message to Dr. Parhiz about the prison's lack of follow-up care. Dkt. 41-3 at 7. On October 5, 2020, a Monday, Dr. Parhiz arranged for Plaintiff to be transported to his office. *Id*. Upon examination, Dr. Parhiz found: "Proliferative Viteroretinopathy OD. Rec OCT. I am not sure of the duration but he has not positioned well and there is a giant tear." *Id*. at 24. Dr. Parhiz recommended immediate surgery and was concerned that, if correctional officers took Plaintiff back to prison, he might not be able to convince them to return him in a timely manner for the needed surgery. *Id*. at 7.

Dr. Parhiz again discussed Plaintiff's situation with him, presented options, and obtained consent for a second surgery. Dr. Parhiz then proceeded to cancel all of his scheduled clinic appointments for the day and obtain an operating room staff so he could immediately proceed with the needed surgery. *Id*., Ex. E. This surgery was uneventful, and Plaintiff was discharged to prison with instructions. *Id*. at 8 & Ex. F.

On October 6, and October 19, 2020, Dr. Parhiz conducted post-operative examinations of Plaintiff, where he observed Plaintiff's second right eye retinal tear had been adequately repaired. *Id*. at 8 & Ex. G, Ex. H. Dr. Parhiz made plans for additional follow-up care at the three-week and three-month marks, but Plaintiff did not return to see

Dr. Parhiz. Dkt. *Id*. at 8-9. On December 11, 2020, Dr. Parhiz's office sent Plaintiff a letter stating that they had made several unsuccessful attempts to contact him to schedule a follow-up appointment and warned him that he should be aware that "missed visits can be detrimental to your vision, which is already at risk due to your retinal condition." *Id*. at 9. Dr. Parhiz's office also made multiple phone calls to the prison nurses' line and sent multiple letters, including one by certified mail, to Plaintiff, to check on him. *Id*. & Ex. I, Ex. J., Ex. K.

Dr. Parhiz never received any response, and his care of Plaintiff ended. Dkt 41-3 at 8-9. Additional care and surgery of Plaintiff's right eye was performed by Dr. Simpson and Dr. Grange. *See* Dkt. 35.

### D. *Conclusion*

The medical records of all treating doctors and Dr. Parhiz's Affidavit establish that Dr. Parhiz never ignored the medical needs of Plaintiff, or treated Plaintiff's serious medical needs in a manner that equated to recklessness or purposeful harm. Nor did Dr. Parhiz "delay" Plaintiff's treatment for any reason except to safely and properly care for Plaintiff. Dr. Parhiz took multiple steps to ensure Plaintiff received two surgeries and follow-up care in a timely manner.

The Court finds that Plaintiff has not laid proper foundation to show any of the following: that he could self-diagnose a torn or broken eye lens; that a torn or broken eye lens would be manifest by a patient reporting that he saw black squares with jagged edges or a curtain with jagged edges in his vision; that the presence of "floaters" or black dots indicated a broken lens; that his performance on the letter chart was due to broken lens

pieces overlapping and blocking his vision; that Plaintiff's lenticular changes were visually significant; that Plaintiff's right eye problems were not due to a cataract or glaucoma; that leaving oil in Plaintiff's eye after the second right eye retinal surgery was not appropriate; that Dr. Parhiz could have removed the oil from Plaintiff's eye even though Plaintiff did not attend any follow-up visits; that cataract surgery was not within the range of proper responses to Plaintiff's complaints of seeing black squares with jagged edges or black dots or having a lack of vision; or that his obscured vision was not due to was "laser debris" and/or distortion due to the gas bubble in his eye.

Other similar cases likewise conclude. In *Gonzalez v. Wright*, 665 F. Supp. 2d 334, 347–48 (S.D.N.Y. 2009), the court reasoned that, when a prisoner receives "extensive medical treatment" for the medical condition, rather than showing the patient was "ignored," the facts point to nothing more than a potential malpractice claim—not a deliberate indifference claim. In *Gonzales*, the prisoner's claim was "that, despite a massive amount of attention, including no fewer than four surgeries and repeated treatments with sprays, nasal steroids, antibiotics and other medications, his chronic sinusitis was not fixed until 2007, when he had his fourth and final septoplasty." *Id.*

In *Fox v. Fischer*, 04 Civ. 6718, 2005 WL 1423580 (S.D.N.Y. June 14, 2005), *aff'd* 242 Fed.Appx. 759 (2d Cir. 2007) (unpubl.), the court held there was a lack of deliberate indifference where the record showed the prisoner received extensive medical treatment for his sinus and ear problems:

> He saw two E.N.T. specialists; he used the sick call procedure regularly; he was given two courses of antibiotics; a set of x-rays was taken and he received a hearing test; he took

> three prescription medications; he had his ear drained by an
> E.N.T.; and he had a drainage tube placed in his ear.
> Unfortunately, Fox's pain and hearing loss persisted despite
> this treatment, but such is sometimes the nature of sinus
> disorders. Defendants were far from deliberately indifferent to
> Fox's medical needs; arguably, they provided him with more
> care than the average non-incarcerated individual with sinus
> problems would receive. If Fox did suffer hearing loss as a
> result of his condition, as he alleges, he may have a medical
> malpractice claim, which he may pursue in state court. But the
> treatment he received at Sing Sing was more than adequate to
> satisfy Eighth Amendment standards.

*Id*. at *3 (emphasis added).

Similarly, here, Plaintiff received extensive medical treatment for his eye condition.

Nothing in the record shows that Dr. Parhiz was aware of a serious risk of harm to Plaintiff

because of the methods Dr. Parhiz chose. Nothing shows that Dr. Parhiz knew of, or drew

the inference, that Plaintiff would encounter any undue risk by any of the treatment

selected, or that Dr. Parhiz acted in a reckless manner. The serious risks of eye surgery

were explained to Plaintiff, and Plaintiff consented to the surgeries despite the risks.

Dr. Parhiz consistently acted to avoid delays, which was in Plaintiff's best interest;

the only delay caused by Dr. Parhiz was his proper refusal to attempt retinal surgery without

retinal-trained staff. Nothing in the record shows that St. Alphonsus Hospital would have

permitted Dr. Parhiz to proceed with surgery without trained staff on the night Plaintiff was

admitted. Nothing shows that Dr. Parhiz acted deliberately to ensure that Plaintiff would

lose his vision in his right eye and become blind. To the contrary, the entire record tends

to show that Dr. Parhiz went out of his way to perform surgeries on Plaintiff in a timely

manner, even though he had never operated on prisoners or worked with prison officials

before, because Dr. Parhiz knew that time was of the essence in trying to save Plaintiff's vision in his right eye. Dr. Parhiz is entitled to summary judgment on all of Plaintiff's claims.

### E.  Disputes of Fact Not Material to Decision

Plaintiff has identified several instances of disputes of fact that are not material to the Court's decisionmaking. In addition, Plaintiff's briefing is filled with other alleged instances of "genuine disputes of material fact" that have no foundation in medical expertise and thus are mere speculation, and therefore, do not create genuine disputes of material fact. The Court will review a few, but not all, of these disputes that are not relevant to the summary judgment decision. To the extent that the Court may not expressly address each dispute, it has rejected them.

On September 19, 2020, about a week after the retinal reattachment surgery, an infirmary staff person documented:

> Patient is non compliant with plan of care per surgeon. He has been told 3 times today all from 0800-12— that he must be face down on his stomach, patient does not comply, becomes argumentative and makes excuses on why this is not happening. He has stated it was because I was giving him medications I told him that I saw him through the window before I entered and he was not complying he has no reason to give at that point.

Dkt. 41-4 at 43. Dr. Parhiz's records show that, during this office visit, Plaintiff admitted he had been noncompliant with discharge instructions. Dkt. 41-3 at 7. Plaintiff states that this prison medical staff person and Dr. Parhiz are lying or mistaken.

The Court finds that whether Plaintiff was noncompliant with the instruction to keep

his head in a downward facing position for three weeks is disputed, but the dispute is not material to the outcome of the summary judgment motion. There is nothing showing that whether or not Plaintiff kept his head down has anything to do with whether Dr. Parhiz was deliberately indifferent to Plaintiff's serious medical condition.

Plaintiff also points to the fact that, on "November 5, 2020, Dr. Richard Murray, an optometrist, diagnosed Plaintiff with "recurrent erosion of cornea, right eye." Dkt. 52-4 at 20; 41-4 at 75-76. Dr. Murray provides no opinion that this condition was caused by Dr. Parhiz or by any wrongful action of a medical professional. Dr. Murray's records do not indicate he saw broken lens pieces in Plaintiff's eye. This record does not aid Plaintiff's position.

### STATUS OF REMAINING CLAIMS

The claims against Dr. Grange and Dr. Mong remain. As this Order clarifies, any motions for summary judgment from either side must focus on the Eighth Amendment deliberate indifference standard, and not a medical malpractice or gross negligence standard. Plaintiff shall not rely on speculation and his own opinions in his briefing, as he has done here. Within 60 days after entry of this Order, the remaining parties shall file either a dispositive motion or a notice of intent to proceed to trial, with an estimate of the days needed for trial and five alternative time periods counsel is available for trial.

### ORDER

**IT IS ORDERED:**

1. Defendant Dr. Parhiz's Motion for Summary Judgment (Dkt. 41) is GRANTED.

MEMORANDUM DECISION AND ORDER - 30

All claims against Dr. Parhiz are DISMISSED with prejudice.

2.  The Clerk shall enter a Rule 54(b) Judgment in favor of Dr. Parhiz.

3.  The Court finds that any the appeal against Dr. Parhiz would be frivolous and taken in bad faith, because there are no conceivable non-frivolous arguments that could show that Plaintiff's claims are meritorious. Accordingly, Plaintiff's in forma pauperis status (Dkt. 5) is revoked only as to claims against Dr. Parhiz. Plaintiff may petition the Court of Appeals to grant in forma pauperis status on appeal.

4.  The remaining parties shall act on the remaining claims as outlined above.

DATED: November 13, 2024

David C. Nye
Chief U.S. District Court Judge