UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD BRINK,<br><br>                    Plaintiff,<br><br>v.<br><br>DR. ALI TERAB PARHIZ, Vitreo-retinal Surgeon-Idaho Retina Center; DR. LANDON K. GRANGE, at Vison Quest Medical Center; and DR. JAROD MONG, Director of Ophthalmology-Vision Quest Medical Center/Proprietor;<br><br>                    Defendants. | Case No. 1:22-cv-00413-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are Dr. Mong and Dr. Grange's Motion for Summary Judgment, which is now fully briefed. Dkts. 64, 76, 79, 81. Also pending are related motions, including a Motion for Leave to File a Supplemental Complaint, filed by Plaintiff Donald Brink, an inmate in custody of the Idaho Department of Correction (IDOC). Dkts. 67, 68, and 77. Having reviewed the parties' submissions and considered their arguments, the Court enters the following Order granting the Motion for Summary Judgment on claims against Dr. Mong, and granting in part and denying in part the motion as to claims against Dr. Grange, with the partial denial based on the need for supplemental factual information and briefing. The Court also addresses Plaintiff's motions.

**STANDARDS OF LAW**

Summary judgment is appropriate when a party can show that, as to a claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show material facts are not in dispute, a party may cite to particular parts of the record or assert that the adverse party is unable to produce admissible evidence to support a material fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider the parties' citations to the record, but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

To state a claim under 42 U.S.C. § 1983, the civil rights statute, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To state a claim under the Eighth Amendment, which prohibits cruel and unusual punishments, a plaintiff must allege facts meeting both an objective standard (the deprivation was serious enough to constitute cruel and unusual punishment) and a subjective standard (a mindset of deliberate indifference on the part of the defendant). *See Hudson v. McMillian*, 503 U.S. 1, 5, 8-9 (1992).

As to the objective standard, the Supreme Court has explained that, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those

needs are 'serious.'" *Id.* at 9. The United States Court of Appeals for the Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain….

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal quotation marks and citations omitted), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

The subjective prong of "deliberate indifference" means that a defendant acted in a way that exhibits something "more than ordinary lack of due care for the prisoner's interests or safety," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result," including reckless conduct that can be equated with a desire to inflict harm. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (internal quotation marks omitted).  Stated another way, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Mere provision of inadequate medical care does not itself amount to deliberate indifference. Rather, the defendant must act with the requisite state of mind when providing inadequate care. *Id.* This element of an Eighth Amendment claim usually is proven through circumstantial evidence and eyewitness testimony. *Id.*

In assessing evidence at summary judgment, the Court does not determine the

credibility of affiants or weigh the evidence. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv.*, 809 F.2d at 630, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," or if a litigant needs more time to obtain declarations or do discovery, the Court may "give an opportunity to properly support or address the fact," "defer considering the motion or deny it," or "issue any other appropriate order." Fed. R. Civ. P. 56(d) & (e).

## REVIEW OF MOTION FOR SUMMARY JUDGMENT

### 1. Discussion of Claims against Dr Jacob Mong

Defendant Dr. Jacob Mong is an ophthalmologist who owns and operates Vision Quest Medical Center, a surgical ophthalmology business that contracted with IDOC's contracted medical provider to provide outside ophthalmology services to prisoners. Dkt. 64-1 at 2. Dr. Landon Grange is an Idaho-licensed ophthalmologist, specializing in cataract surgery, who worked for Vision Quest. *Id*.

Because Dr. Grange is an independently-licensed physician with the state of Idaho, Dr. Mong did not directly supervise Dr. Grange's patient caseload, review his patient charts, attend his appointments, or participate in surgery with Dr. Grange. *Id*. at 3. Insufficient evidence in the record exists to show that Dr. Mong participated in Plaintiff's medical appointments, provided treatment or care to Plaintiff, or had personal involvement in Plaintiff's medical care. *Id*.

The "respondeat superior" theory of liability against a defendant—that a person is liable merely for being the supervisor of a tortfeasor—does not apply to federal civil rights claims. Rather, a person may be held liable as a supervisor under § 1983 if he had "personal involvement in the constitutional deprivation," or if "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation" exists. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted). *See also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Allegations sufficient to show a causal connection include: (1) "setting in motion a series of acts by others"; (2) "knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) failing to act or improperly acting in "the training, supervision, or control of his subordinates"; (4) acquiescing "in the constitutional deprivation"; or (5) engaging in "conduct that showed a reckless or callous indifference to the rights of others." *Starr,* 652 F.3d at 1207-08 (internal quotation marks and alterations omitted).

Here, Dr. Grange worked for Dr. Mong, but Dr. Mong did not directly supervise Dr. Grange's work. Plaintiff has not provided sufficient facts to show that any *Starr* factor

applies to show that Dr. Mong had any type of personal participation in Dr. Grange's surgery or Plaintiff's treatment. For example, liability would be at issue if Dr. Mong permitted a doctor he employed to continue to perform cataract surgery while Dr. Mong knew of a pattern of patient complaints, Idaho Board of Medicine complaints, or medical malpractice suits contending that the employed doctor's work was below community medical standards. This type of evidence is not found in the record; discovery is now closed, and it will not be reopened as to Dr. Mong. Plaintiff has had adequate opportunity to produce anything in existence. Speculation that Dr. Mong later fired Dr. Grange, without any causal connection to Plaintiff's facts, is insufficient at this late date.

For all of the foregoing reasons, Dr. Mong is entitled to summary judgment.

### 2. Discussion of Claims against Dr. Landon Grange

#### A. *Plaintiff's Pre-existing Conditions and Prior Surgery*

As of 2020, Plaintiff had virtually no use of his left eye (not at issue here) as a result of prior problems. Plaintiff had a history of combined forms of glaucoma, macular degeneration, right and left eye retinal detachments, dry eye syndrome, and right eye cataract. Dkt. 64-2 at 3.

In September 2020, Plaintiff was taken to the emergency room for a right eye retinal detachment. Dr. Parhiz performed the surgery. Plaintiff sued Dr. Parhiz, but these claims were dismissed on summary judgment.

Dr. Parhiz left oil in the posterior of Plaintiff's right eye for retinal healing, a normal part of the surgical process. *See* Order at Dkt. 62. But the remaining oil made Plaintiff's eye unstable for future cataract surgery, making surgery more challenging. Dkt. 64-2 at 16.

On February 25, 2021, Dr. Richard Murray, the prison optometrist, initiated a consultation request with Corizon[1] administrators or schedulers: "Patient desperately needs cataract Sx OD." Dkt. 64-5 at 45. Corizon referred Plaintiff to Vision Quest for evaluation and possible treatment for the right eye cataract.

### B.  Dr. Grange's Pre-Surgery and Surgical Care

On March 26, 2021, Dr. Grange examined Plaintiff for the first time. Dr. Grange performed multiple diagnostic tests and observed Plaintiff's right eye. He diagnosed Plaintiff with a "nuclear cataract: right eye, very symptomatic, rapidly worsening" and "insipient cataract: right eye." Dkt. 64-3 at 4.

Dr. Grange determined that Plaintiff was an appropriate candidate for cataract surgery. *Id*. At that time, Dr. Grange recognized: "Because of Plaintiff's complex pre-existing conditions and issues with both eyes, I anticipated the surgery may be a difficult one. I also understood that Plaintiff was at a much higher risk for known complications, due to the poor condition of his eye." *Id*. at 6.

The goal of cataract surgery is to remove the clouded lens and replace it with a clear artificial intraocular lens (IOL). Doing this requires the breaking apart and removal of the natural lens. Dkt. 64-3 at 5.

Dr. Grange's consent note of March 26, 2021, reflects that he made Plaintiff aware of the risks of cataract surgery, including "partial or total loss of vision … pain … the need for additional surgery for complications including a broken posterior capsule." Dkt.  64-5

---

[1] At the time, Corizon was the private entity that contracted with the IDOC to provide medical treatment to Idaho inmates.

at 12. The note reflects that Plaintiff signed the standard consent form (the consent form itself is not in the record). *Id*.; Dkt. 64-5 at 23.

On May 6, 2021, Plaintiff returned to Dr. Grange's office for cataract surgery. After Dr. Grange broke the lens during surgery (a routine part of cataract surgery), "Plaintiff suffered a rent in the posterior capsule with loss of a nuclear fragment, meaning a piece of his fractured lens traveled into his retina." Dkt. 64-3 at 7. Because Dr. Grange is not a retinal specialist, he determined that the best course of action to protect Plaintiff's vision was to have a retinal specialist with special training remove the lens fragments after the eye healed from the cataract surgery. *Id*.

Dr. Grange left Plaintiff without a lens in his right eye because the eye lacked sufficient "zonular support for a 3 piece lens" during the cataract surgery. Dkt. 64-5 at 26. Plaintiff required treatment from a retinal specialist before a new lens could be inserted. Dkt. 64-3 at 7.

In summary, three complications occurred during surgery. One was that the posterior capsule, where oil from the prior retinal surgery had been placed, was ruptured or "rent," causing leakage of oil into the anterior area of the eye. Dkt. 64-3 at 16. Two was that a lens fragment lodged in the retina that could not be safely retrieved. *Id*. Three was that the surgery resulted in "insufficient zonular support for a 3 piece lens." Dkt. 64-5 at 26.

### C. Dr. Grange's Post-Surgical Acts and Differences among his Records and Communications

Plaintiff points to differences among Dr. Grange's medical records to bolster his

claim that Dr. Grange attempted to hide surgical errors or complications. To state an Eighth Amendment claim above and beyond a medical malpractice claim of mere error, Plaintiff has alleged that Dr. Grange purposely hid the complications to cause Plaintiff to go blind or did so with reckless disregard for Plaintiff's health.

Two records of the same surgery exist—one that explains the complications that occurred, and one that does not. The shorter record, reported on the date of surgery, May 6, 2021, does not mention rupture of the posterior capsule that caused oil to leak into the anterior capsule, does not mention that a lens fragment left in Plaintiff's eye would need to be removed, and does not mention that an artificial lens was not implanted due to insufficient zonular support. Dkt. 76-4 at 14. Plaintiff refers to this shorter record in his briefing as the "falsified miniature operation report." This report bears only an *electronic* signature of Dr. Grange. *Id*.

The longer surgery record, reported on May 7, 2021, the day after surgery, discusses the problems with the oil in the eye, the lens fragment imbedded in the retina, and the decision to do nothing more for lack of specialty tools and expertise, but to refer Plaintiff to a retinal specialist to address these complications, which would require a repeat vitrectomy, lens fragment removal, and sewn-in or anterior chamber IOL (artificial intraocular lens). Dkt. 64-5 at 26. An oddity about this record is that the portion discussing the complications is in a smaller font than the rest of the report, possibly indicating it was added at a different time or by a different person. Unlike the May 6, 2021, surgery record, the May 7, 2021 longer surgery record bears Dr. Grange's *handwritten* signature. It is unclear what the process or purpose of the differing records was—is this a routine way

records are generated in the medical field, or was this an anomaly, and, if so, for what purposes were the differing records generated?

Plaintiff asserts that only the shorter report that does not detail any complications was sent to Corizon after the May 6, 2021, surgery. While that may be true, on May 7, 2021, Dr. Grange signed and sent a "clinical summary" to Corizon officials, stating, "Please call with questions or concerns," adding his personal telephone number. He wrote, "We need to send him to the University of Utah for vitrectomy and sewn in IOL OD [right eye]. In meantime we will do standard post op drop regimen." Dkt. 78-3 at 3. Even if Dr. Grange sent only the shorter report to Corizon, this clinical summary discloses that a *vitrectomy* was needed, the definition of which is removal of post-surgery debris from the eye. This procedure is done when certain problems occur during cataract surgery.[2] This addresses the second complication, though not with particularity, and it is unclear whether removal of silicone oil is also a routine part of a vitrectomy or not. *See* Dkt. 78-7 at 6-7. The disclosure that a "sewn-in IOL" would be needed indicates insufficient zonular support for an IOL lens, which is disclosure of the third complication. *See* Footnote 5, *infra*.

Dr. Grange ordered Plaintiff to return for a post-op examination, which occurred on May 7, 2021. Dkt. 64-3 at 8-9. No mention of the need for a lens implant or removal of the lens fragments is included in this record of the appointment of May 7, 2021, *id.* at 33-35, but Dr. Grange's Declaration says that he orally reviewed complications and necessity of

---

[2] *See* https://www.aao.org/eye-health/treatments/what-is-vitrectomy#:~:text=
During%20vitrectomy%2C%20the%20ophthalmologist%20removes,made%20of%20gas%20or%20oil
(accessed 6/24/2025).

follow-up surgery with Plaintiff during that appointment. Dkt. 64-2 at 8-9. Plaintiff's statements to Corizon staff (see below) indicate that, by May 10 2021, Plaintiff had been informed that complications occurred and the lens could not be placed. Dkt. 78-3 at 6.

The post-operative appointment examination record from May 7, 2021, does not show that Plaintiff was left without an implanted artificial lens, but says "pseudophakia: right eye."[3] Dkt. 64-5 at 34. A "Clinical Encounter Note" from the same appointment indicates an eye history of "Cataract extraction, phaco with IOL; OD".[4] Dkt. 78-3 at 14. This note does not show Plaintiff was left without a lens. But Plaintiff knew he had no lens before May 10, 2021, when Plaintiff was seen by Corizon Nurse Practitioner Sarah Kern, who reported that Plaintiff stated "he was originally only told to use the eye drops that Dr. Grange prescribed for a few days and then since there were complications and the lens couldn't be placed, he was told to continue the drops for a few weeks." Dkt. 78-3 at 6. Kern stated, "We currently do not have any notes regarding the surgeon's plan of care so I will contact the office to get a verbal on what we should be doing." *Id.*

On May 11, 2021, four days after the post-op examination, Dr. Grange spoke with Alyssa Punzalan of Corizon, who asked Dr. Grange to amend the appointment record of May 7, 2021, to show "P[atient] is Aphakic, no lens implanted." Dkt. 64-5 at 35. Dr.

---

[3] "Pseudophakia" means "false lens," that, is, an intraocular lens (IOL) that is implanted in the eye after the natural lens has been removed, typically during cataract surgery. https://www.ncbi. nlm.nih.gov/medgen/ 146336#:~:text=Definition,from%20HPO%5D (accessed 5/27/2025).

[4] "Phaco," short for phacoemulsification, which is modern extracapsular cataract extraction surgery, involves the removal of the lens fibers, which form the nucleus and cortex of the cataract, leaving the posterior epithelial capsule to hold the new artificial intraocular lens (IOL) and keep the vitreous humor away from the anterior chamber. *See* https://emedicine.medscape.com/article/1844198-overview.

MEMORANDUM DECISION AND ORDER - 11

Grange added that clarification. *Id*.

On May 17, 2021, eleven days after the cataract surgery, Plaintiff followed up with Corizon by submitting a Health Services Request seeking information about the artificial lens implant for his right eye. Dkt. 78-3 at 20.

On May 19, 2021, Plaintiff told Corizon Nurse Practitioner (NP) Susan Sansom, that, in the cataract surgery, "they had to take out so much meat that there was not enough left to put the lens in…. It has been recommended that he go to the University of Utah to have his IOL sewn in." Dkt. 78-3 at 22. NP Sansom made a consultation request: "offsite clinic, ophthalmology, urgent, referred to UM team for review." Dkt. 78-3 at 24. A "Condensed Consultation Request" of the same date from NP Sansom states: "Please schedule the patient with the University of Utah for vitrectomy to sewn in IOL as recommended by Dr. Grange as soon as possible." *Id*. at 25.

On June 4, 2021, Plaintiff returned to see Dr. Grange. Dkt. 64-3 at 8-9. Dr. Grange's records show that he did "counseling" with Plaintiff, including: "Follow up in SLC for secondary IOL placement and vitrectomy OD." Dkt. 64-5 at 38. Also on June 4, 2021, Dr. Grange provided Loretta Ruthie of Corizon a notification regarding his assessment of Plaintiff, including a copy of a clinical note, which documented the need for follow-up care with a retinal specialist. Dkt. 64-5 at 36-42.

Dr. Grange heard nothing from Plaintiff or Corizon after June 2021. On October 1, 2021, Centurion Health took over the IDOC prisoner medical health contract after Corizon

completed its contract.[5]

On November 23, 2021, Dr. Grange participated in a telephone call with a Centurion representative named Renee about the need for Plaintiff to receive follow-up care with a retinal specialist. Dr. Grange provided the representative with the contact information of the Utah retinal specialist he had recommended to Corizon in May. *Id*. at 43. Other specifics of this conversation have not been disclosed.

### D. Plaintiff's Eye Care after Dr. Grange's Surgery

On December 9, 2021, optometrist Brent Sexauer examined Plaintiff's right eye and noted, "Cornea OD corneal scar/mild overlying epithelial defect; anterior chamber OD: displaced IOL superiorly/vitrectomy fluid. Dkt. 78-5 at 14. Plaintiff was diagnosed with central corneal opacity, right eye." *Id*. This condition has also been called "erosion of the cornea." *Id.* at 20, 23. Plaintiff reported to prison medical staff that his vision had been decreasing since his surgery with Dr. Grange. Dkt. 78-6 at 4-5. He reported that he was feeling constant pressure in his right eyebrow and was afraid he had a corneal infection like in the past. *Id*. at 10. Dr. Sexauer also had a concern that Plaintiff had a possible detached retina again. Dkt. 78-6 at 1. Plaintiff was sent to the hospital emergency room the same day, but there was no ophthalmologist on staff. *Id*.

On December 10, 2021, Plaintiff had an emergency visit with Dr. Scott Simpson, the Idaho retinal specialist who had worked on Plaintiff's left eye in the past, to rule out a

---

[5] *See, e.g.*, https://idahocapitalsun.com/2021/10/26/idaho-department-of-correction-replaces-prison-health-care-provider/#:~:text=with%20Corizon%20Health.-,Corizon%20was%20
established%20in%202011%2C%20after%20merging%20with%20two%20other,1%2D%20Sept
(accessed 6/24/2025).

detached retina. Dr. Simpson examined Plaintiff and noted the problems of emulsified oil and lens fragments in the right eye. Dkt. 62 at 19. Dr. Simpson determined that Plaintiff would need surgery. *Id*. When Dr. Simpson saw Plaintiff in December 2021, there is no indication in his records that he concluded that Plaintiff's emulsified oil or lens fragment conditions were an emergency because of Plaintiff's glaucoma condition or for any other reason. Dkt. 35 at 1-2.

On January 10, 2022, Dr. Simpson again noted the "emulsified SO and retained lens fragments in the right eye" and ordered Plaintiff to be returned for surgery. *Id*. at 5-6.

On January 13, 2022, Dr. Simpson performed surgery on Plaintiff's right eye. Dkt. 78-7 at 8. On January 14, 2022, Dr. Simpson had a follow-up appointment that summarized Plaintiff's need for surgery as follows: "He had developed emulsification of the silicone oil and intraocular pressure problems. He required surgery in January to remove the silicone oil and the retained lens fragment." Dkt. 35 at 11.

A notation about Dr. Simpson's January 2022 surgery shows:

> There were extensive emulsified silicone bubbles. The patient had a retained lens fragment. It was hung up in the inferior vitreous base. This was freed with the vitrector. The fragment was too large to remove with the vitrector. Therefore, the 20-gauge sclerotomy was then opened again and the phaco fragmatome[6] was used to remove the lens fragments. The eye was inspected indirect. There were no iatrogenic tears. There was one questionable area that was treated with laser.

---

[6] A fragmatome is a long tube that can apply ultrasonic energy to a lens fragment to emulsify it as well as to aspirate the resulting small lens particles. *See* https://tvst.arvojournals.org/article.aspxarticleid=2748022#:~:text=In%20the%20case%20of%20retained,the%20resulting%20small%20lens%20particles (accessed 7/15/2025).

Dkt. 78-7 at 9.

On January 3, 2023, Dr. Simpson examined Plaintiff again. He did not necessarily recommend an IOL, but recommended testing to determine whether that or another solution, such as contact lenses, might be best under the circumstances:

> Mr. Brink has a history of retinal detachment in both eyes. The right eye was repaired by Dr. Parhiz in 2020. By history this required multiple surgeries and also placement of silicone oil. I repaired the left eye in 2011. This also required multiple surgeries and placement of silicone oil. The last time I had seen him was 2014. I then saw him in December 2021. *He had developed high intraocular pressure secondary to emulsified silicone oil.* I removed the silicone oil in the right eye as well as a small retained lens fragment in January 2022. I removed the silicone oil in the left eye in May 2022. The last time I saw him was in June 2022. On examination today [January 23, 2023] the retinas are attached and look stable. He is aphakic in both eyes and has some silicone oil droplets in both eyes. We discussed the very small risk he has for developing a recurrent detachment. I have asked him to monitor his vision. If he notices any significant changes, I asked him to return. He is aphakic in both eyes. He needs a refraction to see what his vision potential is. If he sees substantially better with a refraction, then it would be worthwhile having intraocular lenses placed. He is being seen elsewhere for this. He also has glaucoma in both eyes with advanced changes. He is currently on medication to [sic] this. He will need to continue to follow up with the other doctor for treatment of glaucoma.

Dkt. 35 at 23-24 (emphasis added). The italicized portion of Dr. Simpson's note seems to indicate that Plaintiff's high intraocular pressure was caused by from the emulsified silicone oil due to the rent in the posterior capsule of the right eye during the cataract surgery of May 2021.

On June 16, 2022, Plaintiff's medical records noted that he was consistently running out of latanoprost due to the small 2.5 ml. bottle size given. Dkt. 78-8 at 2. The record also

MEMORANDUM DECISION AND ORDER - 15

notes that Plaintiff had difficulties getting an appointment with the glaucoma specialist due to scheduling issues at the prison. *See* Dkt. 78-7, 78-8 and 78-9.

On January 23, 2024, two years after Dr. Simpson's surgery, Plaintiff saw Stephanie Warden in optometry, who recommend: "Needs to be scheduled for refraction to determine best Rx due to severe vision loss from advanced glaucoma." Dkt. 78-9 at 12.

### E. Analysis

In the supplemental pleadings, Plaintiff clarifies his claim regarding Complication One. He asserts that Dr. Grange punctured "the oil sack" in the right eye, causing emulsification damage and permanent damage to Plaintiff's vision, including worsening of his glaucoma condition and—important to the Eighth Amendment deliberate indifference claim—failed to disclose this complication to Plaintiff, Corizon, or Centurion. The nondisclosure, in turn, caused Plaintiff, Corizon, and Centurion to not have vital information that might have prompted a follow-up surgery sooner than eight months after Dr. Grange's cataract surgery. This is not quite a correct reading of the medical records (there was no "sack" of oil), but the Court liberally construes this supplemental allegation to be that Dr. Grange failed to disclose that he *punctured the posterior capsule of Plaintiff's right eye that contained the oil from the prior retinal surgery*, causing emulsification damage and permanent damage to Plaintiff's vision, including worsening of his pre-existing glaucoma condition, temporarily or permanently. Dr. Simpson's record showing that Plaintiff "had developed high intraocular pressure secondary to emulsified silicone oil" tends to support the objective prong of Plaintiff's Eighth Amendment claim.

What is needed, as noted above, is additional factual information about the

subjective prong of the Eighth Amendment claim. Do the differing records of the same surgery provide circumstantial evidence that Dr. Grange intended to hide this complication from Plaintiff and Corizon? Or is there another explanation for the differences? Was the leakage of oil something that is considered part of a vitrectomy such that it did not need to be separately disclosed? Did Dr. Grange know that the leaking oil could have caused high intraocular pressure with Plaintiff's pre-existing glaucoma condition? Was the emulsification a risk of intraocular pressure that was low or non-existent if the follow-up retinal surgery would have been conducted within a shorter time after the two-week period needed for healing of the cataract surgery?[7] Did Dr. Grange have any reason to believe that the follow-up surgery would not have been scheduled more quickly?

Many questions remain unanswered and can be probed when the Court re-opens discovery as to Complication One (the leaking oil). Importantly, the focus is not on what errors were made, but what Dr. Grange's mindset, intentions, and purposes were after surgery. Failing to disclose the leaking oil issue to Plaintiff, Corizon, and Centurion would amount to deliberate indifference only if Dr. Grange was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and if he actually drew the inference. *See Farmer*, 511 U.S. at 838. A defendant's "failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment under [United States

---

[7] The record reflects that Dr. Simpson himself left oil in Plaintiff's left eye after retinal re-attachment surgery in 2014, and did not remove it until 2022, when it had emulsified (but he had not seen Plaintiff in between those dates). Dkt. 78-7 at 25.

Supreme Court] cases." *Id.*

Courts uniformly have held that a mere falsification in a patient medical record—without evidence of subjective deliberate indifference—does not form the basis of an Eighth Amendment deliberate indifference claim. *Smith v. Iverson*, No. 8:19CV298, 2019 WL 4417548, at *11 (D. Neb. Sept. 16, 2019) ("Falsification of medical records, in and of itself, generally will not give rise to a § 1983 claim."); *Williams v. Bentivegna*, No. 14-CV-6105-CJS, 2015 WL 162994, at *7 (W.D.N.Y. Jan. 13, 2015) (allegation that doctors wrote false information in plaintiff's medical record "might amount to malpractice, but not a constitutional violation"); *Moore v. Casselberry*, 584 F. Supp. 2d 580, 582 (W.D.N.Y. 2008) (allegation that prison nurse filed a false or incomplete inmate medical report did "not state a federal constitutional violation"); *Johnson v. Lew Sterrett Crim. Just. Ctr.*, No. 3:02-CV-647M, 2003 WL 23473095, at *4 (N.D. Tex. Feb. 28, 2003) (allegation that medical director "gave false statements about [inmate's] medical records, failed to provide reports, and lost his medical records" were "not violations of [inmate's] constitutional rights" and did "not rise to the level of deliberate indifference to his serious medical needs").

However, false information in a medical record can give rise to an inference of deliberate indifference if it is accompanied by other evidence. This Court's review of cases addressing somewhat similar circumstances includes the following.

- *Ruggiero v. Canfield*, No. 14-CV-00307A(F), 2017 WL 9485692, at *15 (W.D.N.Y. Mar. 23, 2017), *report and recommendation adopted*, No. 14-CV-307-A(F), 2017 WL 5152178 (W.D.N.Y. Nov. 7, 2017). "Plaintiff's allegations, which are consistent with the records attached to the Complaint, establish discrepancies which plausibly could be construed as an attempt to

minimize the serious nature of the lump, leading to the denial of the Second Biopsy Referral. Not only could the location of the axilla lump, and its non-response to the continuous warm soaks, indicate involvement of the lymph nodes which could indicate a malignancy, that by the time the lump was surgically excised, the lump had become intertwined with the axillary vein and brachial plexus nerves, resulting in permanent moderate to severe nerve damage in Plaintiff's dominant right arm and hand begs the question not only whether more timely excision of the lump would have prevented such damage, but whether Dr. Canfield, who is medically trained, was deliberately indifferent to Plaintiff's serious medical need by failing to be more aggressive with regard to his treatment of the lump."

- *White v. Clement*, 116 F.Supp.3d 183, 188-89 (W.D.N.Y. 2015). The court denied summary judgment to a defendant registered nurse where evidence showed the nurse's failure to properly document the inmate plaintiff's symptoms that indicated a possible adverse reaction to prescription medication, and continuing to prescribe same medication, could constitute deliberate indifference to the inmate's serious medical need.

- *Hathaway v. Coughlin*, 37 F.3d 63, 67–69 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995). A two-year delay before evaluation for surgery to alleviate chronic hip pain, during which time inmate's physicians withheld relevant information regarding the cause of the pain, could support deliberate indifference inference against prison physician whose involvement with the inmate's treatment was not limited merely to referring the inmate to a specialist, but rather, personally examined and treated the inmate and, as such, was the official most familiar with the inmate's condition."

  "A jury could infer deliberate indifference to Hathaway's serious medical needs from [Dr.] Foote's failure (1) to disclose the broken pins and to discuss the option of surgery with Hathaway despite his sudden resurgence of hip pain and (2) to refer Hathaway for re-evaluation for surgery until late 1982 despite requests for further treatment from Hathaway and student attorneys acting on his behalf." *Id*. at 68-69.

As to Complications Two and Three, it is clear that Dr. Grange disclosed the need for a vitrectomy (which, by definition, is used to clean up debris left in the eye after cataract surgery complications) and the need for a sewn-in IOL (which is the same as a repair or work-around for the lack of zonular support for an IOL) to Plaintiff and Corizon shortly

after the surgery, whether or not it was written in the shorter version of the surgery record. At that point, it was up to Plaintiff and Corizon or Centurion to schedule an appointment for the follow-up retinal surgery. Therefore, Dr. Grange is entitled to summary judgment regarding Complications Two and Three.

### F. Other Factual Questions not Answered by the Current Record and Plaintiff's Request for Appointment of an Court Expert Witness

The Court will order another round of summary judgment on his supplemental claims against Dr. Grange regarding Complication One (the leaking oil). *See* Dkts. 77, 78. The Court will also permit the parties to conduct limited discovery only on this claim. Other issues and questions the parties should address are as follows.

Additional information is needed as to whether Dr. Grange brought the leaking oil complication to the attention of Plaintiff, Corizon, and Centurion, and whether Dr. Grange drew the inference or did not draw the inference of whether there was a serious risk of harm if he did not bring the leaking oil issue to the attention of Plaintiff, Corizon, and Centurion. If Dr. Grange asserts he did not draw the inference, he must support that assertion with facts surrounding his decisionmaking. In other words, with his ophthalmology training and experience, why did he make the decision he did? Plaintiff may conduct additional discovery on these issues and point to circumstantial evidence or other doctors' records or testimony to show otherwise.

The current status of Plaintiff's right eye is unclear. Dr. Grange's Declaration states: "In reviewing the medical records of Plaintiff, I would note it is recorded Plaintiff's eyesight seems to have improved following the care he received from numerous providers,

including myself. This supports the appropriate care he received, given his significant medical history regarding his eyesight." Dkt. 64-3 at 10. Dr. Simpson's records stated: "Patient is doing reasonably well following eye surgery to remove lens fragments." Dkt. 78-7 at 20. By March 2022, Dr. Simpson noted that Plaintiff presented with blurry vision in the right eye that was moderate and unchanged. *Id*. at 24.

Dr. Grange's reasoning for his conclusion that no harm occurred from the delay in follow-up surgery is unexplained (including whether Plaintiff suffered glaucoma pain that he otherwise would not have had), let alone explained in layperson terms (including for the Court's benefit), and the reasoning is not supported by citations to any medical records. The parties may desire to clarify the meaning of the existing records or submit additional current medical records. The parties should address not only the status of Plaintiff's vision (compared to before the cataract surgery), but the status of Plaintiff's glaucoma. The parties should clarify from medical records whether the glaucoma condition was worsened as a result of the emulsified oil in the right eye or whether the worsening (if it occurred) was caused by something else, and whether any evidence shows that Dr. Grange could have drawn an inference as to any impact of the nondisclosure of the leaking oil on Plaintiff's glaucoma condition.

The parties should also address Dr. Simpson's conclusion that Plaintiff has "extensive proliferative vitreoretinopathy," including an explanation of that condition. Whether this condition is relevant to the remaining issue is currently unknown.

Another open issue is that, at times, Plaintiff stopped taking the medication that controls his eye pressure, which would lead to an increase in pain and other glaucoma

symptoms. On June 4, 2021, Dr. Grange recommended continuing the latanoprost drops. Dkt. 78-4 at 13. A Centurion note from June 4, 2021, says "Consider restarting prednisolone drops BID." Dkt. 78-4 at 6. Dr. Simpson "restarted" the Timolol and Alphagram prescriptions in December 2021, and said he wanted to "control the pressure in the eye a little bit better," Dkt. 35 at 2. Whether Plaintiff regularly complied with this instruction and took his medications should be clarified.

The Court will currently deny Plaintiff's request for a court expert witness because the subjective prong of the deliberate indifference test is primarily at issue, which is not about what another expert thinks, but what Dr. Grange actually thought. Where the record already contains numerous medical opinions not in dispute with one another, an expert is not required. *See, e.g., Woodroffe v. Oregon*, No. 2:12-CV-00124-SI, 2014 WL 1383400, at *5 (D. Or. Apr. 8, 2014). Further, Rule 706 may not be invoked simply to "appoint an expert on behalf of an indigent civil party." *Id.*; *see also Gorton v. Todd*, 793 F. Supp. 2d 1171, 1178 n.6, 1184 n.11 (E.D. Cal. 2011) (Rule 706 did not permit the appointment of a neutral expert witness solely for an indigent prisoners' "own benefit" in aiming to prove deliberate indifference). However, the Court will re-open discovery on the limited issue identified above.

Finally, Plaintiff should reference exactly where in the medical records he has evidence of causal links to support the following conclusions: Plaintiff asserts that the leakage and emulsification of the oil in his right eye permanently worsened his pre-existing glaucoma condition. Plaintiff asserts that his pain during the time frame between Dr. Grange's surgery and Dr. Simpson's surgery on his right eye was due to emulsification of

oil in his right eye. Dr. Grange may provide contrary evidence, if any.

The Court will reconsider the summary judgment request of Dr. Grange after supplemental briefing and submission of evidence is completed. The parties need not re-brief the existing motion, but should provide only new, supplemental briefing (which may reference the existing record), and any new evidence.

Going forward, Dr. Grange must define the medical terms the first time they are used in the record. The Court should not have to consult the Internet to define the terms found in the briefing and the medical records.

**CONSIDERATION OF PLAINTIFF'S REQUEST
TO SUPPLEMENT HIS PLEADINGS TO PROCEED
AGAINST PRISON MEDICAL PROVIDERS**

Based on the current medical records in Plaintiff's possession, he now desires to bring claims against the prison medical provider, Centurion, and its officers, directors, and employees. Some of these new claims are only tangentially related to the claims against the current outside medical doctors that were alleged in the original Complaint, and other claims (such a failure to treat heart and kidney problems) are entirely new and unrelated to the current Defendants. Supplementation as to Dr. Mong (denied) and Dr. Grange (granted in limited fashion) has been addressed above.

### 1. Deadline for Amended Pleadings

Plaintiff's original filing, construed as a complaint, was filed three years ago, on September 29, 2022, a year and a half after Dr. Grange's surgery, and nine months after Dr. Simpson's right eye surgery. Dkt. 1. The Court ordered Plaintiff to file a proper amended pleading, which he did on April 21, 2023. Dkt. 10.

On June 2, 2023, the Court ordered that all amended pleadings must be submitted within 150 days after the first Defendant answered the Amended Complaint. All Answers were filed on August 4, 2023, and, therefore, Plaintiff's amended complaint was due no later than January 2, 2024. Medical records from outside providers were subpoenaed by the Clerk of Court and provided to Plaintiff between January 11, 2024, and February 8, 2024.

On April 10, 2025, more than one year after Plaintiff's received the subpoenaed records, he moved for authorization to file a supplemental or amended complaint. Dkt. 77.

Plaintiff has provided insufficient reasons why he could not have filed a supplemental complaint shortly after having received the medical records from the providers. Plaintiff's continuous and extensive filings in this case contradict his assertion that anything outside of Plaintiff's control, including his eyesight issues, contributed to his failure to file an amendment within a reasonable period of time. For example, between February 2024 and August 2024, Plaintiff filed documents at Dkts. 43, 44, 46, 52 through 52-7, 56, 57, 59, and 60. Because of lack of diligence, untimeliness, and failure to show adequate cause, Plaintiff's motion will be denied as to the request to add new defendants.

## 2. Relation Back

Because Plaintiff's new claims against new parties arising between 2020 and early 2023 would now be barred by the two-year statute of limitations if he attempted to bring a new lawsuit, he asserts that the claims "relate back" to his original pleadings (September 30, 2022) or his amended pleadings (April 21, 2023). "Relation back" is a statute of limitations issue that is a different issue from the procedural bar discussed above—that he

missed the deadline for *amendment* of his pleadings. After considering Plaintiff's relation

back arguments, the Court also rejects the proposed supplemental or amended complaint

against the new defendants on this separate ground, as well.

Federal Rule of Civil Procedure 15(c)(1) governs "relation back" in civil rights

proceedings:

> An amendment to a pleading relates back to the date of the
> original pleading when:
>
> (A) the law that provides the applicable statute of
> limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose
> out of the conduct, transaction, or occurrence set out—or
> attempted to be set out—in the original pleading; or
>
> (C) the amendment changes the party or the naming of
> the party against whom a claim is asserted, if Rule 15(c)(1)(B)
> is satisfied and if, within the period provided by Rule 4(m) for
> serving the summons and complaint, the party to be brought in
> by amendment:
>
> (i) received such notice of the action that it will not be
> prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would
> have been brought against it, but for a mistake concerning the
> proper party's identity.

But because *§ 1983* has no timeliness or relation back provisions of its own, Federal

Rule of Civil Procedure 15(c)(1)(A) requires the Court to review the Idaho statute of

limitations (used for § 1983 claims); in addition, Idaho rules governing relation back apply.

*See TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); *Merritt v. County of Los*

*Angeles*, 875 F.2d 765, 768 (9th Cir. 1989).

Idaho Rule of Civil Procedure 15(c), provides in part:

> Whenever the claim or defense asserted in the amended

> pleading *arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading*, the amendment relates back to the date of the original pleading.
>
> An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, *within the period provided by law for commencing the action against the party, the party to be brought in by amendment (1) has received such notice of the institution of the action* that the party will not be prejudiced in maintaining a defense on the merits, and (2) *knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party*.

*Id*. (emphasis added).

Plaintiff's new claims do not meet Idaho Rule of Civil Procedure 15(c). He is not contending that there was a mistake concerning the identity of the proper party in his pleadings. Rather, he is intending to name completely different parties who have no relationship to one another. *See, e.g.,* In *Damian v. Est. of Pina*, 974 P.2d 93, 95–96 (Idaho Ct. App. 1999) ("This rule applies when a decedent has been erroneously named as a defendant and the complaint is subsequently amended to substitute the decedent's estate as a party.").

Plaintiff asserts that he did name Doe Defendants in his amended complaint filed on April 21, 2023, but his jailhouse lawyer mistakenly stated that these were associated with the doctors' offices, not the prison medical department. Dkt. 77 at 2. The Amended Complaint names "Defendant Respondent Superior Doe-1" and described the Doe defendant as "a citizen of Idaho, employed as or involved with the other Defendants named herein or as another unknown employee that may have had a relevant involvement in Plaintiff to lose the sight in his right eye…." Dkt. 10 at 4. Plaintiff is correct that these

allegations do *not* show he was naming Centurion or any of its directors, officers, or employees—the term "or involved with the other Defendants named here" is simply too broad and amorphous, given that the Amended Complaint focuses on the outside doctors' eye care. Instead this provision covers persons associated with Dr. Parhiz, Dr. Mong, and Dr. Grange.

Even if the "Doe defendants" are considered properly identified as to the proposed new parties, Rule 15(c) also makes relation back conditional upon the newly added defendants having received notice of the action within the two-year statute of limitations and having known that, but for a mistake concerning the identity of the proper party, the action would have been brought against them. *See Hoopes v. Deere & Co.*, 788 P.2d 201, 204 (1990). No evidence shows these requirements were met.

Moreover, Plaintiff's new eye care claims asserted against the Centurion Defendants are only tangentially related to claims against the ophthalmologists. The new claims are not related enough to show that they arose out of the same conduct, transaction or occurrence referenced in the original pleading. The claims about health care unrelated to the eye issues, such as heart and kidney conditions, are entirely unrelated to the claims against the ophthalmologists. *See Id.* R. Civ. P. Rule 15(c); *Noreen v. Price Dev. Co. P'ship*, 25 P.3d 129, 131–32 (Idaho Ct. App. 2001); *Trimble v. Engelking*, 939 P.2d 1379, 1381–82 (Idaho 1997); *Hoopes v. Deere & Co.*, 788 P.2d 201, 204–05 (Idaho 1990); *Damian v. Estate of Pina*, 974 P.2d 93, 95–96 (Idaho Ct. App. 1999); *see* Fed. R. Civ. P. 15(c)(1)(B)&(C).

Plaintiff states that his supplemental complaint is based upon the disclosure

documents received from Defendants and from the subpoenaed medical care providers. He asserts that he did not discover the evidence supporting the allegations until receipt of these documents. However, it is evident that Plaintiff did not need the documents to file suit against the Centurion Defendants within the statute of limitations. He was *living* the "delay" he complains of, and he could have filed suit at any time, instead of using four or five rounds of concern forms, grievances, or Health Service Requests, as he alleges. He cannot argue he did not know the basis of his claim *as it was happening*. He simply could have filed suit and taken the same steps here to find out the names of those individual medical providers responsible for the delay. He could have discovered the basis for any alleged policy-based claims during discovery in such a case. For these reasons, the Motion to Supplement or Amend regarding new parties will be denied.

## ORDER

**IT IS ORDERED:**

1. The Motion for Summary Judgment of Dr. Jarod Mong (Dkt. 64) is GRANTED. All claims against this Defendant are DISMISSED with prejudice.

2. The Motion for Summary Judgment of Dr. Landon Grange (Dkt. 64) is GRANTED as to Complications Two and Three; and DENIED without prejudice as to Complication One.

3. Plaintiff's Motion to File Supplemental Complaint against Dr. Grange (Dkt. 77) is GRANTED, only to the limited extent set forth above.

4. Plaintiff's Motion to Take Notice of Interlinear Corrections of Pending Pleadings [to correct grammar, word omissions, and spelling] (Dkt 82) is

DENIED in part as improper, because some of the proposed changes are substantive. If the Court has characterized the record improperly, Plaintiff may probe that during the re-opened discovery period and in supplemental summary judgment proceedings.

5. Plaintiff's Motion for Appointment of a Court Expert Witness (Dkt. 67) is DENIED.

6. Plaintiff's Motion to Appoint Counsel (Dkt. 68) is DENIED. Plaintiff is free to use the Idaho State Bar lawyer referral service (indicating to them he is indigent) to find an attorney willing to represent Plaintiff on either a pro bono (with the potential for attorney fees under 42 U.S.C. § 1988) or contingency basis.

7. Discovery, limited to Dr. Grange and Complication One only, is re-opened for a period of **90** days, beginning on entry of this Order.

8. Dr. Grange's supplement to his summary judgment motion is due within **120** days after entry of this Order.

9. Plaintiff's responsive supplement is due within **30** days after Dr. Grange's supplement is filed.

10. Dr. Grange's reply, if any, is due within **14** days after Plaintiff's responsive supplement.

DATED: September 22, 2025

David C. Nye
Chief U.S. District Court Judge