UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DONALD BRINK,

Plaintiff,

v.

DR. ALI TERAB PARHIZ, Vitreo-retinal Surgeon-Idaho Retina Center; DR. LANDON K. GRANGE, at Vision Quest Medical Center; and DR. JAROD MONG, Director of Ophthalmology-Vision Quest Medical Center/Proprietor;

Defendants.

Case No. 1:22-cv-00413-DCN

**MEMORANDUM DECISION AND ORDER**

Pending before the Court in this prisoner civil rights case of Plaintiff Donald Brink are several ripe motions, including Dr. Grange's Motion for Summary Judgment, which the Court now considers. The Court re-opened limited discovery and ordered both parties to submit supplemental briefing on the remainder of the pending summary judgment motion. Supplementation has been completed. *See* Dkts. 87 to 100. Having considered the parties' briefing and reviewed the record in this matter, the Court enters the following Order denying Plaintiff's additional subpoena requests, denying Plaintiff's request to amend his pleadings to add new defendants at this late date, granting the remainder of Dr. Grange's Motion for Summary Judgment, and dismissing this case with prejudice.

## BACKGROUND

Plaintiff asserts that Dr. Grange, an ophthalmologist contracted to provide eye care to Idaho Department of Corrections (IDOC) inmates, acted with deliberate indifference in treating Plaintiff's eye condition in 2021, violating the Eighth Amendment's prohibition on cruel and unusual punishment. The Court earlier granted Dr. Grange summary judgment on two complications that occurred as a result of Plaintiff's eye surgery. Summary judgment as to the third complication is at issue.

### 1. Plaintiff's Pre-existing Conditions and Prior Surgery

As of 2020, Plaintiff had virtually no use of his left eye (not at issue here) as a result of prior problems. Plaintiff had a history of combined forms of glaucoma, macular degeneration, right and left eye retinal detachments, dry eye syndrome, and a right eye cataract. Dkt. 64-2 at 3.

In September 2020, Plaintiff was taken to the emergency room for a right eye retinal detachment. Dr. Parhiz performed the surgery. Plaintiff sued Dr. Parhiz, but these claims were dismissed on summary judgment.

Dr. Parhiz placed silicone oil in the posterior of Plaintiff's right eye for retinal healing, a normal part of the surgical process. *See* Order at Dkt. 62. But the oil made Plaintiff's eye unstable for future cataract surgery, making surgery more challenging. Dkt. 64-2 at 16.

On February 25, 2021, Dr. Richard Murray, a prison optometrist, initiated a

consultation request with Corizon[1] administrators: "Patient desperately needs cataract Sx OD." Dkt. 64-5 at 45. Corizon referred Plaintiff to Vision Quest for evaluation and possible treatment for the right eye cataract.

**2. Dr. Grange's Pre-Surgery and Surgical Care**

On March 26, 2021, Dr. Grange of Vision Quest examined Plaintiff for the first time. Dr. Grange performed multiple diagnostic tests and observed Plaintiff's right eye. He diagnosed Plaintiff with a "nuclear cataract: right eye, very symptomatic, rapidly worsening" and "insipient cataract: right eye." Dkt. 64-3 at 4.

Dr. Grange determined that Plaintiff was an appropriate candidate for cataract surgery. *Id*. At that time, Dr. Grange recognized, "Because of Plaintiff's complex pre-existing conditions and issues with both eyes, I anticipated the surgery may be a difficult one. I also understood that Plaintiff was at a much higher risk for known complications, due to the poor condition of his eye." *Id*. at 6.

The goal of cataract surgery is to remove the clouded lens and replace it with a clear artificial intraocular lens (IOL). Doing this requires the breaking apart and removal of the natural lens. Dkt. 64-3 at 5.

Dr. Grange's consent note of March 26, 2021, reflects that he made Plaintiff aware of the risks of cataract surgery, including "partial or total loss of vision … pain … the need for additional surgery for complications including a broken posterior capsule." Dkt. 64-5 at 12. The note reflects that Plaintiff signed the standard consent form (the consent form

---

[1] At the time, Corizon was the private entity that contracted with the IDOC to provide medical treatment to Idaho inmates.

itself is not in the record). *Id.*; Dkt. 64-5 at 23.

On May 6, 2021, Plaintiff returned to Dr. Grange's office for cataract surgery. After Dr. Grange broke the lens during surgery (a routine part of cataract surgery), "Plaintiff suffered a rent in the posterior capsule with loss of a nuclear fragment, meaning a piece of his fractured lens traveled into his retina." Dkt. 64-3 at 7. Because Dr. Grange is not a retinal specialist, he determined that the best course of action to protect Plaintiff's vision was to have a retinal specialist with special training remove the lens fragments after the eye healed from the cataract surgery. *Id.*

Dr. Grange left Plaintiff without a lens in his right eye because the eye lacked sufficient "zonular support for a 3 piece lens" during the cataract surgery. Dkt. 64-5 at 26. Plaintiff required treatment from a retinal specialist before a new lens could be inserted. Dkt. 64-3 at 7.

### 3. Remaining Issue for Summary Judgment

The complication at issue is that oil from the prior retinal surgery had been placed in the posterior eye capsule was ruptured or "rent," causing leakage of oil into the anterior area of the eye during Dr. Grange's cataract surgery. Dkt. 64-3 at 16. In particular, the Court has narrowed the question down to whether Plaintiff has provided sufficient admissible facts to show that Dr. Grange subjectively acted with deliberate indifference when he did not particularly disclose that complication to Corizon and Centurion prison health care providers.

In the prior round of summary judgment, the Court determined that, for the Eighth

Amendment analysis as to Complication One (the leaking oil), it needed additional factual information about the subjective prong of the Eighth Amendment claim.

**STANDARD OF LAW**

Summary judgment is appropriate when a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show material facts are not in dispute, a party may cite to particular parts of the record or assert that the adverse party is unable to produce admissible evidence to support a material fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider the parties' citations to the record, but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

In assessing evidence at summary judgment, the Court does not determine the credibility of affiants or weigh the evidence. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv.*, 809 F.2d at 630, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Pro se inmates are exempted "from *strict* compliance with the summary judgment

rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

To state a claim under 42 U.S.C. § 1983, the civil rights statute, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To state a claim under the Eighth Amendment, which prohibits cruel and unusual punishments, a plaintiff must allege facts meeting both an objective standard (the deprivation was serious enough to constitute cruel and unusual punishment) and a subjective standard (a mindset of deliberate indifference on the part of the defendant). *See Hudson v. McMillian*, 503 U.S. 1, 5, 8-9 (1992).

As to the objective standard, the Supreme Court has explained that, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9. A "serious medical need" includes "failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain." *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal quotation marks and citations omitted), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

The Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand

specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him].”).

The subjective prong of “deliberate indifference” means that a defendant acted in a way that exhibits something “more than ordinary lack of due care for the prisoner’s interests or safety,” but “something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result,” such as reckless conduct that can be equated with a desire to inflict harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (internal quotation marks omitted). Stated another way, a defendant “must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” *Id.*

Mere provision of inadequate medical care does not itself amount to deliberate indifference. Rather, the defendant must act with the requisite state of mind when providing inadequate care. *Id*. This element of an Eighth Amendment claim usually is proven through circumstantial evidence and eyewitness testimony. *Id*.

“Deliberate indifference is a high legal standard.” *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). A plaintiff must show that the doctor knew of a serious risk to the plaintiff and chose to disregard that risk.

*Toguchi v. Chung* is a case where a doctor made a wrong conclusion about drug interaction and caused the death of a prison patient. Dr. Chung had treated inmate Toguchi several times in the past. The final time she treated him, she prescribed a course of medication that expert witnesses for the plaintiffs (Toguchi’s surviving parents) opined caused a toxic level of drugs in his bloodstream, causing his death.

The Ninth Circuit, however, rejected the plaintiffs' expert witness opinions that the treating physician, Dr. Chung, had been deliberately indifferent. The Court focused on what Dr. Chung *knew* and *believed* before her allegedly wrongful acts or omissions. In response to an argument that Dr. Chung should have considered the prescription drug Cogentin an excessive risk to the deceased inmate's health, the Court opined: "Because she did not *believe* that Cogentin use presented a serious risk of harm to Keane, her conduct cannot constitute deliberate indifference" or punishment under the Eighth Amendment. *Id*. at 1058 (emphasis added).

In *Toguchi*, the Court explained.

> *It does not matter whether Dr. Chung's assumptions and conclusions were reasonable*. Rather, *so long as she was not subjectively aware of the risk* that Keane could be suffering from a drug overdose, and disregarded that risk, she was not deliberately indifferent. *Farmer*, 511 U.S. at 837.

*Id*. at 1060 (emphasis added).

Summary judgment for Dr. Chung was appropriate because she relied on her professional judgment, believed that her chosen course of treatment for the prisoner was medically appropriate, and did not have the benefit of other medical specialists' opinions recommending otherwise. Contrarily, in *Snow v. McDaniel*, 681 F.3d 978, 981 (9th Cir. 2012),[2] the Ninth Circuit Court held that summary judgment could not be granted where, for three years, prison doctors had ignored the consistent recommendation by two outside specialists that the prisoner needed hip surgery to alleviate his severe pain and mobility

[2] *Snow* was overruled on other grounds by *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

issues.

Where defendants know of a substantial risk to an inmate's health, the defendants may not be liable under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. "There is not one proper way to practice medicine … but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted). Mere differences in judgment as to appropriate medical diagnosis and treatment between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted).

To violate the Eighth Amendment, the medical provider's choice of treatment must have been "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998); *see also Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.").

Finally, in every § 1983 action, the plaintiff must provide facts showing that " the

defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008)) (citing *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)). To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation. *Harper*, 533 F.3d at 1026 (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996); *Arnold*, 637 F.2d at 1355). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

## DISCUSSION

The factual record in this case gives Plaintiff and the Court a glimpse into the extraordinarily complex world of eye surgery. Without having any medical training, Plaintiff picks out bits and pieces of his long course of treatment to support his contention that Dr. Grange acted recklessly or purposely to cause Plaintiff to lose sight in his remaining eye. Plaintiff defines medical terms as a layperson and infers causation from medical records where there is none, for example, that Dr. Simpson reported that the leaking oil *caused* irreparable optic nerve damage—which is nowhere in the exhibit Plaintiff identifies (Dkt. 90 at 9, referring to Dkt. 90-2 at 22 (Exhibit G at 2, ¶ 4)). Dr. Grange has provided insight into what he knew and why he made the decisions he did. Dr. Simpson's and other treating doctors' records support Dr. Grange's position.

When seeking cataract surgery, Plaintiff presented with an array of serious pre-existing conditions. Before cataract surgery, Dr. Grange informed Plaintiff that the very complications that did happen might happen; Plaintiff chose to proceed. The Court

concludes that the current record before it contains sufficient evidence to show that no genuine dispute of material fact exists regarding Dr. Grange's assessment of the complications, medical choices among the risks presented, and disclosures to Plaintiff and prison medical providers.

For summary judgment purposes, Plaintiff has met the objective prong of the Eighth Amendment standard of law. Dr. Scott Simpson's record showing that Plaintiff had developed high intraocular pressure secondary to emulsified silicone oil demonstrates an objectively serious medical condition.

The Court asked the parties to supplement the record with information to aid in determining several questions related to the subjective prong. In discussing the supplemental facts, the Court will also address Plaintiff's assertions that parts of the record create a dispute of material fact that should preclude summary judgment.

The Court asked Dr. Grange to explain why there were two different versions of his surgical note for the May 6, 2021, cataract surgery. Plaintiff has alleged that Dr. Grange purposely hid the complications to cause Plaintiff to go blind or did so with reckless disregard or Plaintiff's health. The earlier record of the same surgery does not mention rupture of the posterior capsule that caused oil to leak into the anterior capsule, does not mention that a lens fragment left in Plaintiff's eye would need to be removed, and does not mention that an artificial lens was not implanted due to insufficient zonular support, *see* Dkt. 93-1 at 6; while the later record details these complications and the recommendations for remedying them, *see id*. at 8-9. Plaintiff refers to the shorter record in his briefing as the "falsified miniature operation report."

The longer surgery record, reported on May 7, 2021, the day after surgery, discusses Dr. Grange's decision to do nothing more for lack of specialty tools and expertise, but to refer Plaintiff to a retinal specialist to address these complications, which would require a vitrectomy, lens fragment removal, and sewn-in or anterior chamber IOL (artificial intraocular lens). Dkt. 64-5 at 26. An oddity about this record is that the portion discussing the complications is in a smaller font than the rest of the report, possibly indicating it was added at a different time or by a different person. The May 6, 2021, shorter surgery record bears only an electronic signature of Dr. Grange, while the May 7, 2021, longer surgery record bears Dr. Grange's *handwritten* signature. In the prior round of summary judgment, the Court noted that it was unclear what the process or purpose of the differing records was and asked Dr. Grange to explain whether this a routine way records are generated in the medical field, or whether this was an anomaly, and, if so, for what purposes the differing records were generated.

Dr. Grange explains:

> At the time, it was the standard practice at Vision Quest to have a basic template of whichever anticipated procedure was to be performed on a patient prepopulated in the system and if the patient showed up and the procedure was actually performed, this templated note would be created with an electronic signature affixed, essentially as a placeholder until the provider was able to modify the templated note to more accurately reflect what actually occurred during the procedure. Sometimes this practice is referred to as a "quick op report vs. full op note" and this practice is widely accepted in the medical field. I do not actually consider the templated note to be a formal part of the patient's record once the completed note is

> finalized.[3] Sometimes I was able to finalize the templated note on the day of the procedure, other times it was done the following day, as time allowed. Once I had completed the addendum to the templated note, it was my practice to then actually, physically sign the note (versus an electronic signature) to finalize it. The difference in the fonts between the templated note, which was produced on May 6, 2021, the day of the procedure, *see Cannon Dec*., Ex. A, and the completed note of May 7, 2021, *see Cannon Dec*., Ex. B, is the function of my having to go in and manually add relevant information to the original template for the procedure I must stress that I followed this standard practice in documenting what occurred in the plaintiff's procedure just as I did with all other patients I saw at Vision Quest. There was nothing out of the ordinary in this practice and it was not done in an effort to conceal the complications the plaintiff suffered.

Dkt. 93-2, *Grange Decl.*, ¶ 2 (footnote added).

Plaintiff questions why the "quick op report," dated May 6, 2021, at 12:30 p.m., was electronically signed on May 10, 2021, at 2:29 p.m., but at the same time admits that a copy of the "quick op report" was sent back to the prison with the correctional officers after the surgery on May 6. Dkt. 76 at 3-4.

The "full op report," dated May 7, 2021, at 2:22 p.m., bears the handwritten signature of Dr. Grange, but no handwritten date. This report is not found in the prison medical unit's records.

One of Plaintiff's improper assumptions is that Dr. Grange is personally managing medical records and sending out reports from his surgeries. Plaintiff was given opportunity to engage in additional discovery, but he did not obtain any clarification about the report

[3] This explanation shows why the record did not have a Bates stamp on it. It is numbered page 989 of 1144 of IDOC's medical records of Plaintiff.

dates or when or how much Dr. Grange is involved in the creation of the quick op report, dating of surgical reports, and sending of surgical reports to patients' referring doctors. All that is known is from his declaration that he revises the templated quick op report into an actual full op report usually within a day of surgery. What happens after that is not known.

Plaintiff does not provide any facts showing that Dr. Grange, rather than an administrative employee, prepared and sent the quick op report or failed to send the full op report. Nothing in the record shows that Dr. Grange's office normally sends either the quick op report or the full op report to referring doctors, rather than only a letter or other correspondence that provides information about post-surgical care, as was done here. Without evidence that Dr. Grange personally participated in the managing and distribution of surgical reports in this case, no purposeful intent to hide complications or provide a sanitized report to prison medical providers can be attributed to him.

Based on the explanation Dr. Grange has provided, the medical records referenced below, and the absence of necessary evidence described above, the Court concludes that the "quick op report" and the "full op report" issues do not create a genuine dispute of fact as to the subjective intent of Dr. Grange after the complications occurred during surgery.

Dr. Grange's intent to remedy the complications to preserve Plaintiff's vision can be gleaned from his correspondences with prison medical providers:

| | |
|---|---|
| May 7, 2021 | Plaintiff had a one-day post-op appointment with Dr. Grange. Plaintiff reported his pain and poor vision was steadily improving. Dkt. 78-3 at 14. He reported a white spot in his field of vision. *Id*. The "Plan" portion of the appointment record focuses on Plaintiff's next two weeks of care, with a follow-up appointment in one week or sooner to "recheck with refraction." *Id*. at 15. |

| | |
|---|---|
| | Also on this date, Dr. Grange reviewed the surgery complications with Plaintiff, which is not reflected in the notes, but which is evident because Plaintiff reported them to prison medical staff on May 19, 2021.<br><br>Also on this date, Dr. Grange provided the following clinical summary to prison medical providers (Corizon) on Corizon's form: "We need to send him to the University of Utah for vitrectomy to sewn in IOL OD. In meantime we will do standard post op drop regimen." Dkt 78-3 at 3. He stated: "Please call with questions or concerns," adding his personal telephone number. *Id*. |
| May 10, 2021 | Corizon Registered Nurse (RN) Sarah Kern examined Plaintiff's eye. "[T]here was no purulent discharge present and the pain had decreased significantly." Plaintiff was afraid the eye might be infected, but Nurse Kern saw no signs of infection, such as a red eye, discharge, or an unclear pupil. Dkt. 78-3 at 7. Plaintiff told Kern that "he was originally only told to use the eye drops that Dr. Grange prescribed for a few days and then since there were complications and the lens couldn't be placed, he was told to continue the drops for a few weeks." *Id*. Kern did not see "any notes regarding the surgeon[']s plan of care," so she called the office. *Id*. She verified that the Ofloxacin, ketorolac, and prednisolone are to be continued 1 gtt TID for 1 week, and then all three should be tapered to 1 htt BID for 2 weeks. Dkt. 78-3 at 11. |
| May 11, 2021 | Corizon employee Alyssa Punzalan requested an addendum to the May 7, 2021, appointment record. Dr. Grange complied, writing: "OT is aphakic[4] with no lens implant." *Id*. at 16. |
| May 19, 2021 | Plaintiff saw a prison nurse practitioner who made a written request for an offsite ophthalmology visit with "urgent" priority. The request was "referred to UM Team for Review." Dkt. 78-3 at 24. The procedure requested was " Please schedule the patient with the University of Utah for vitrectomy to sewn |

[4] The Court notes the following general definition: "Aphakia is a condition in which you're missing the lens of one or both of your eyes. You can be born that way or lose the lens due to an injury. Or your doctor might remove it during an operation for cataracts. When you have aphakia, it's hard to see things clearly with the affected eye. But doctors can correct it with surgery, special glasses, or contact lenses." https://www.webmd.com/eye-health/aphakia-overview (accessed 4/6/2024).

| | |
|---|---|
| | in IOL as recommended by Dr. Grange as soon as possible." Dkt. 78-3 at 25. |
| May 26, 2021 | RN Nicole Moir said there was no plan of care in the medical record. She referred him to see Nurse Practitioner (NP) Crossley, who called Vision Quest, who informed her Plaintiff was referred to SLC. Dkt. 78-1 at 13. |
| June 4, 2021 | Plaintiff saw Dr. Grange for a post-operative appointment. Dkt. 78-4 at 8-13. Plaintiff reported consistent pain in right eye since surgery, and that his left blind eye was also painful. *Id*. at 8-9. Impressions were recorded as aphakia in the right eye, retinal detachment with retinal break in the right eye, and primary open-angle mild glaucoma in the right eye.<br><br>The general plan noted was "Follow up in SLC for secondary IOL placement and vitrectomy OD." Plaintiff was ordered to continue latanoprost drops.<br><br>Also on this date, Dr. Grange sent a record of the visit for "evaluation of Aphakia, right eye," to Loretta Ruthie at IDOC. 78-4 at 12. The record sent to Ms. Ruthie also stated: "Follow up in SLC for secondary IOL placement and vitrectomy OD. Continue latanoprost drops." *Id*. at 13.<br><br>Also on this date, Corizon employee Kasey Holm followed up with Dr. Grange's office personnel who said Plaintiff "[n]eeds vitrectomy secondary to IOL OD in SLC. Consider restarting prednisolone drops BID in meantime." Dkt. 78-4 at 6. |

The foregoing records show that Dr. Grange was actively involved in Plaintiff's aftercare to the extent he could be, given that the prison was in charge of Plaintiff's aftercare. The records show that the internal prison medical unit request for authorization for the vitrectomy was recognized by prison medical officials as "urgent" and that it should be done "as soon as possible." Dkt. 78-3 at 24-25.

Dr. Grange referred Plaintiff to the University of Utah eye surgery center for the vitrectomy. Because there was no mention of the rupturing of the oil from the posterior eye

capsule and the fragment of the lens left in Plaintiff's eye in the foregoing records and correspondence, the Court asked Dr. Grange to explain that omission.

Dr. Grange explains:

> In in this patient's case, the removal of the oil by necessity would have been a part of the vitrectomy I referred him for. The oil needed to be removed in order for the retinal specialist to perform the needed vitrectomy. It did not require an additional procedure to remove the oil, and there was no need for additional notice to the plaintiff specifically about the oil, although I did verbally tell the plaintiff following the surgery about the complications including the issue of the oil I also informed the staff charged with the follow up care of the plaintiff of this complication, and the need for its treatment via the recommended vitrectomy.

Dkt. 93-2 at ¶ 4.

A *vitrectomy* is defined as removal of post-surgery debris from the eye after cataract surgery.[5] Plaintiff has provided no medical opinion showing that Dr. Grange's explanation is not standard knowledge or practice among ophthalmologists and retinal specialists.

This explanation is bolstered by the fact that, both times Plaintiff saw Dr. Simpson after Dr. Grange's surgery, Dr. Simpson identified the oil issue on his own when he examined Plaintiff's retina; the first time he saw Plaintiff in 2021 was for another condition, a suspected detached retina. In other words, Dr. Simpson's records show that removal of the oil did not need to be separately disclosed from a cataract surgeon to a retinal specialist. Without something more from a cataract or retinal specialist, Plaintiff has not shown that

---

[5] *See* https://www.aao.org/eye-health/treatments/what-is-vitrectomy#:~:text= During%20vitrectomy%2C%20the%20ophthalmologist%20removes,made%20of%20gas%20or%20oil (accessed 6/24/2025).

omission of the oil issue when a patient is referred for a vitrectomy after cataract surgery on "as soon as possible" prioritization is a factual basis for a finding of deliberate indifference.

The record reflects that Dr. Grange was consistently responsive to prison medical care officials as they were attempting to schedule Plaintiff's vitrectomy. On October 1, 2021, Centurion Health took over the IDOC prisoner medical health contract after Corizon completed its contract, which may have caused some delay in scheduling the vitrectomy.[6] On November 23, 2021, Dr. Grange participated in a telephone call with a Centurion representative named Renee about the need for Plaintiff to receive follow-up care with a retinal specialist. Dr. Grange provided the representative with the contact information of the Utah retinal specialist he had recommended to Corizon in May. *Id*. at 43.

Dr. Grange states that he told prison medical staff that the vitrectomy should be done "as soon as possible," and that he thought, "[g]iven the follow-up communications I had with various prison medical staff, in which I confirmed the need for the type of treatment needed, I believed they were scheduling the recommended care." Dkt. 93-2, ¶ 6. As noted above, the internal prison medical unit records knew that the vitrectomy was an "urgent" matter, and that it should be done "as soon as possible." Dkt. 78-3 at 24-25.

Plaintiff has no expertise to interpret the priority of these recommendations for care as necessitating "emergency" scheduling, such as might be done for a detached retina or

---

[6] *See, e.g.*, https://idahocapitalsun.com/2021/10/26/idaho-department-of-correction-replaces-prison-health-care-provider/#:~:text=with%20Corizon%20Health.-,Corizon%20was%20
established%20in%202011%2C%20after%20merging%20with%20two%20other,1%2D%20Sept
(accessed 6/24/2025).

heart attack. When Plaintiff had an emergency visit with Dr. Simpson to rule out a detached retina on December 10, 2021, no detached retina was found, but Dr. Simpson also evaluated the need for a vitrectomy, but not as an emergency. Dr. Simpson examined Plaintiff and noted the problems of emulsified oil and lens fragments in the right eye. Dkt. 62 at 19. Dr. Simpson determined that Plaintiff would need surgery. *Id*. When Dr. Simpson saw Plaintiff in December 2021, there is no indication in his records that he concluded that Plaintiff's emulsified oil or lens fragment conditions were an emergency because of Plaintiff's glaucoma condition, eye pressure, or for any other reason. Dkt. 35 at 1-2.

On January 10, 2022, Dr. Simpson again noted "emulsified SO and retained lens fragments in the right eye" and ordered Plaintiff to be returned for surgery. *Id*. at 5-6. On January 13, 2022, Dr. Simpson performed surgery on Plaintiff's right eye. Dkt. 78-7 at 8. The record does not show that Plaintiff's post-cataract surgery condition should have been treated as an emergency by Dr. Grange.

Further, nothing in the record shows that Dr. Grange caused a delay in the vitrectomy surgery. Rather, prison medical staff had difficulty finding a surgery center willing to perform the vitrectomy on a prisoner, and the prison's contracted medical company was changed, as noted in the timeline in the next section. Dr. Grange had nothing to do with the late scheduling.

The Court also asked Dr. Grange to state whether he knew the oil in the eye could have caused high intraocular pressure with the pre-existing glaucoma condition. Dr. Grange explains:

> I was aware of the need for this follow up treatment, in part, due to the possibility of the oil causing the plaintiff to suffer high intraocular pressure in part due to his pre-existing, and serious, glaucoma. However as with many medical procedures and treatments there is a risk/benefit analysis in the risk of higher intraocular pressure versus benefit of the oil remaining in the eye to keep the eye properly inflated.
>
> …
>
> I was aware of the risk of harm to the plaintiff if he did not have the follow-up vitrectomy, that being his vision could go from bad to worse. My recommendation for follow-up care was done in an effort to help preserve his vision to the greatest extent possible. Based upon my ophthalmological education, training, and experience my referral to a retinal specialist was literally the only option available to try to assist the plaintiff.

Dkt. 93-2 at ¶¶ 5-6.

Under the Eighth Amendment, a prisoner "is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." Here, Dr. Grange has made it clear that he was subjectively aware of a serious risk to the plaintiff. But deliberate indifference is a *chosen or reckless* disregard for the plaintiff's health, despite knowing the risk. Here, Dr. Grange states that he chose a vitrectomy because there was no other alternative to help preserve Plaintiff's already-limited vision. Importantly, he was not subjectively aware of, nor did he have any reason to believe that, given his detailed communications with prison officials that the procedure should be completed "as soon as possible," they were not scheduling the vitrectomy in a timely manner.

Causation of any delay in the vitrectomy lies with some combination of prison medical providers and with outside providers declining to provide this type of surgery to prisoners. Plaintiff's Declaration states: "I submitted no less than six (6) requests for

surgery and treatment for my damaged right eye between June 7, 2021, and August 10, 2021." Dkt. 78-1 at 13.

No deliberate indifference can be attributed to Dr. Grange from this course of events, given that the presence of the oil was still playing a role in keeping the eye inflated after Dr. Parhiz's retinal surgery.[7] In fact, Dr. Simpson, who had performed retinal surgery on Plaintiff's left eye in 2011, had left oil in Plaintiff's left eye to keep it inflated for over a decade; Dr. Simpson did not remove the emulsified left eye oil until 2022. Dkt. 35 at 23-24 (emphasis added); Dkt. 64-5 at 48. The record before the Court shows that Dr. Grange was aware of the risks, performed a reasonable risk/benefit analysis, disclosed what was necessary to Plaintiff and the prison medical providers, acted with diligence in referring Plaintiff to a retinal specialist, had no knowledge that the vitrectomy would take so long to schedule, and acted with the intent to help preserve Plaintiff's vision, and not out of recklessness or with purpose to cause Plaintiff harm.

The final question the Court asked each party to address was causation of any temporary pain to Plaintiff or permanent damage to Plaintiff's vision, including exacerbation of his glaucoma condition. The Court notes that, with the additional supplementation from the parties, it is unnecessary to review damages, because Plaintiff has not raised any genuine dispute of fact as to whether Dr. Grange had subjective

[7] At this point in the proceedings, the Court will not entertain any debate on whether the oil leaking from the posterior to the anterior capsule decreased or discontinued its inflation capabilities without an opinion from another ophthalmologist. And, regardless, the narrow question here is not what other ophthalmologists think, but what Dr. Grange thought at the time he made the decision to refer Plaintiff to have a vitrectomy at the University of Utah as soon as possible.

deliberate indifference; therefore, the claim fails for the lack of evidence supporting that element before the Court reaches the damages question.

**PLAINTIFF'S CHANGED GLAUCOMA CONDITION AND REQUEST FOR ADDITIONAL MEDICAL RECORDS**

Plaintiff seeks to subpoena medical records from four medical offices that treated Plaintiff's glaucoma condition prior to Dr. Grange's surgery to establish the severity of his condition prior to the surgery. Dkt. 89 at 1. The motion will be denied for three reasons.

First is that the remaining focus of summary judgment is on the subjective prong of the deliberate indifference standard of law. Dr. Grange has provided his subjective reasoning that shows he was aware of the risks of oil remaining in the eye, but the path he chose was for the purpose of keeping Plaintiff's eye inflated until a retinal specialist could treat Plaintiff.

Importantly, nothing in the record shows that Dr. Grange had any reason to expect that the prison was not going to schedule the vitrectomy in a timely manner. This addresses the subjective prong of deliberate indifference. If Plaintiff had a lengthy bout of pain as a result of the pressure from glaucoma, due to failure of the University of Utah to cooperate with prison officials to schedule the vitrectomy in a timely manner, Dr. Grange did not anticipate it. In addition, Plaintiff's eye issue, unfortunately, bridged the change of medical providers, causing the entire process to begin again, causing further delay. Dr. Grange had nothing to do with these factors outside his knowledge and control.

The second reason is that Dr. Grange and Dr. Simpson have opined similarly in the record as to Plaintiff's long-standing severe glaucoma, and so no further opinions are

necessary. Plaintiff is confused between having long-standing, irreversible severe glaucoma and having adequate maintenance treatment for that condition.

Plaintiff argues that Dr. Grange wrote in his record that Plaintiff had "mild" glaucoma, not severe. Dr. Grange explains that the same record states Plaintiff presented with "diffuse RNFL thinning," which "is indicative of severe, long-term glaucoma, and it is not a condition which occurs overnight." Dkt. 93-2 at ¶ 3. Dr. Grange explains that "such a condition suggests as much as fifteen years of inadequate treatment for glaucoma." *Id*. Dr. Grange further explains:

> When a patient suffers from this advanced stage of glaucoma, as the plaintiff had at this time, it means the optic nerve tissue is depleted, and practically none is left…. Based upon my evaluation of the plaintiff and review of his medical history, his optic nerve in his right eye was essentially "dead" from advanced glaucoma when I initially examined him.

*Id*.

Again, this is a different assessment than whether a severe case of glaucoma is being adequately treated and monitored by the use of eye drops. Dr. Grange opines: "It is possible that the plaintiff would experience increased pain or other glaucoma symptoms if he was not taking his medications as directed." Dkt. 93-2, ¶ 8. For example, on June 16, 2022, Plaintiff's medical records noted that he was consistently running out of latanoprost due to the small 2.5 ml. bottle size given. Dkt. 78-8 at 2.

Dr. Simpson also noted that Plaintiff had suffered "extensive proliferative vitreoretinopathy." Dr. Grange explains that "this is an indication that the plaintiffs' retina was in extremely poor condition, required additional oil in an attempt to maintain its shape,

that it was badly detached, and had been badly damaged by a reported injury." *Id*. at ¶ 9. Dr. Grange explains that this comment on the condition of Plaintiff's retina was a completely separate matter, and is not a comment on the complications experienced during Dr. Grange's surgical procedure. *Id*.

Third is that other eye doctors' records in this case reflect that Plaintiff's right eye condition has improved and his glaucoma condition is well-managed. The records show Plaintiff "is now on maximum medical therapy for glaucoma, with his pressure well controlled at 12" and "with a significant improvement in his vision in the right eye from 20/400 to 20/100." Dkt. 93-2 at ¶ 6.

For all of the foregoing reasons, the Court will not permit Plaintiff to subpoena additional medical records.

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF DECISION TO DENY REQUEST TO ADD NEW DEFENDANTS BY AMENDMENT OF PLEADINGS**

Plaintiff has filed a Rule 59(e) Motion for Reconsideration of the portion of the Court's September 22, 2025, Order denying in part his request to file a "Supplemental Complaint with Supplemental Defendants, Supplemental Allegations" (Dkts. 77, 78) after the amendment deadline expired. Dkt. 86.

A motion for reconsideration based on Federal Rule of Civil Procedure 59(e) applies only to final judgments or orders. *Balla v. Idaho State Board of Corrections*, 869 F.2d 461, 466–67 (9th Cir. 1989). A Rule 54(b) final judgment was entered as to claims against Dr. Parhiz only (Dkt. 64), but no final order as to remaining claims has been entered in this case.

A different standard applies here. "As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (internal citation omitted). In addition to the inherent power to modify a non-final order, Federal Rule of Civil Procedure 54(b) authorizes a district court to revise a non-final order "at any time before entry of a judgment adjudicating all the claims." On reconsideration, the courts may correct "simple mistakes," as well as alter "decisions based on shifting precedent, rather than waiting for the time-consuming, costly process of appeal." *U.S. v. Martin*, 226 F.3d 1042, 1049 (9th Cir. 2000).

In its September 22, 2025, Order, the Court carefully considered whether Plaintiff should be able to amend his pleadings after the amendment deadline to include claims against Centurion Healthcare, Inc., the contracted prison medical providers, for not only delays in providing follow-up eyecare recommended by the outside medical providers, but for various other claims such as failure to treat heart and kidney problems. Having reviewed that Order again in light of Plaintiff's new arguments about why he should be permitted to proceed against Centurion and its employees at this late date, the Court concludes that amendment will not be permitted.

Additional relevant dates and incidents regarding Plaintiff's claims against the proposed new defendants are as follows:

| | |
|---|---|
| June 8, 2021 | Plaintiff asked for an optometry visit "due to vision issues." Dkt. 78-4 at 15. |

| | |
|---|---|
| June 9, 2021 | Corizon employee Mercedes Rodriguez responded, "There is a wait for optometry. I will put you on the list when I can. You are still scheduled." Dkt. 78-4 at 16. |
| June 27, 2021 | Plaintiff completed an HSR saying his vision was getting worse, he had no prescription, and he need an "Oplomatrist" [sic] and surgery." Dkt. 78-4 at 17. He also completed a Resident Concern Form (RCF) to Corizon Health Services Administrator (HSA) Clara stating that his cataract surgery resulted in a severe injury to his vision that the surgeon was unable to repair, and he was thus referred to the Salt Lake medical center. He stated Corizon refused to send him to the retina surgeon, which is contributing to his loss of vision. Dkt. 78-4 at 19. |
| June 30, 2021 | The response to the RCF was: "His offsite consult has been submitted for review." *Id.* |
| July 3, 2021 | Plaintiff completed an HSR saying he needed to see optometry to determine why surgery was cancelled. Dkt. 78-4 at 24. |
| July 6, 2021 | Plaintiff completed an HSR saying, "Please schedule for provider to discuss vision problems and lack of treatment." Dkt. 78-4 at 18.<br><br>Plaintiff received a response on an HSR stating he had "been approved and accepted by the provider in Utah" and "scheduling is working with that office and security to get you scheduled for surgery." Dkt. 78-1 at 14.<br><br>Plaintiff completed an RCF stating that the provider had inferred (meaning implied) in the last response that the Salt Lake surgery was under review. Prior to that, he had been informed that it was approved and awaiting scheduling. Dkt. 78-4 at 23. |
| July 8, 2021 | HSA Lori Johnson responded that the procedure had been approved with the Utah provider, prison scheduling personnel were working with the Utah office and security schedule the surgery. Dkt. 78-4 at 23. |
| July 15, 2021 | Plaintiff saw nurse practitioner Heather Crossley about his eye, saying his eyesight is diminishing every day. NP Crossley |

| | |
|---|---|
| | informed him that the consult to the University of Utah "is still in the works." Dkt. 78-4 at 20. |
| | Plaintiff separately states in his Affidavit that NP Crossley also stated that his prior approval had been canceled due to the question of "urgency," and Crossley could find only the quick op report in the record which did not detail the complications. Dkt. 78-1 at 14. This explanation is not included in Crossley's medical records—only that the consult "is still in the works." *Cf.* Dkt. 78-4 at 20. |
| August 10, 2021 | Plaintiff submitted an HSR: "Vision loss is severe—I need surgery as referred by Dr. Grange[] to Salt Lake. How many times do I have to ask, how long to wait—3 months so far!?" Dkt. 78-4 at 22. |
| August 13, 2021 | Plaintiff filed a grievance complaining that the medical unit was delaying referral to Salt Lake, "resulting in severe vision loss and possible permanent damage." Dkt. 78-4 at 25. |
| August 31, 2021 | The grievance was answered: "I am sorry for the delay. The hold up is with the Salt Lake facility, they will not schedule an appointment with us for you. We will keep trying." It was signed by Gen Brewer, DON. Dkt. 78-4 at 25. There is no indication in this grievance response that the approval of the vitrectomy had been canceled due to lack of urgency, as Plaintiff alleges above. |
| August 31, 2021 | Plaintiff submitted another HSR: "Medical is not providing me with adequate vision care, no prescription glasses or exams. This is cruel and unusual punishment." Dkt. 78-4 at 22. |
| Sept. 1, 2021 | On the grievance appeal, IDOC employee Rona Siegert responded that the medical scheduler was working very actively with the Utah physician to get the consult and surgery scheduled, but working with an out of state clinic can be difficult. Dkt. 78-4 at 26. |
| **Oct. 1, 2021** | **Centurion Health replaced Corizon as the IDOC's contracted prison medical healthcare provider.** |
| Nov. 13, 2021 | Plaintiff submitted an RCF stating that Centurion refuses to treat his blindness. Dkt. 78-5 at 3. |

| | |
|---|---|
| Nov. 16, 2021 | Prison optometrist Brent Sexauer completed an urgent "Condensed Consultation Request," that said Dr. Grange recommended surgery in Salt Lake with a specialist, and this was a resubmitted consult request for a sewn in IOL. Dr Sexauer agreed with the consult request. Dkt 78-5 at 8. |
| Nov. 16, 2021 | Plaintiff received an answer to an RCF indicating a consult request has been submitted for surgery on 11/16/21. Dkt. 78-5 at 3. |
| Nov. 23, 2021 | Renee, a Centurion employee, spoke with Dr. Grange because she was not sure where in Salt Lake City Plaintiff was to be sent. Dr. Grange explained that it was the University of Utah and provided that phone number. Dkt. 78-5 at 10. |
| Dec. 9, 2021 | Plaintiff had an appointment with Dr. Sexauer. Plaintiff complained of a red right eye, worsening vision and constant pressure in right brow area. Dkt 78-5 at 13. They discussed that surgery at University of Utah is being scheduled. "I placed a urgent referral less than 1 month ago and patient still has not been scheduled." Dkt. 78-5 at 17. The right eye appeared infected. Dkt. 78-5 at 20. |
| Dec. 9, 2021 | An urgent ophthalmology consult was requested by Dr. Sexauer to rule out retinal health changes. Dkt. 78-5 at 22-25. |
| Dec. 9, 2021 | Plaintiff was sent to the emergency room, but they had no ophthalmologist on staff. He was seen by Dr. Chalmer Luke Morris, who recommended that Plaintiff be seen by Dr. Simpson, a retinal specialist the next day. Dkt. 78-5 at 29-31. |
| Dec. 10, 2021 | Plaintiff had an appointment with Dr. Simpson, who noted that Plaintiff was aphakic, had intraocular pressure of 38, emulsified oil in the anterior chamber and vitreous cavity, and retained lens fragments in the right eye. Dkt. 78-6 at 14. |
| Jan. 13, 2022 | Dr. Simpson performed the surgery recommended by Dr. Grange. |
| May 9, 2022 | Plaintiff had a follow-up appointment with Dr. Simpson. Plaintiff's eye pressure was reduced. |

| | |
|---|---|
| Jan. 11, 2023 | Plaintiff had an appointment with Dr. Gealy, retinal specialist, who recommended that Plaintiff be fitted with aphakic contact lenses before doing sutured IOL to establish what visual improvement is present before surgery is indicated. Dkt. 78-11 at 2. |
| June 7, 2023 | A visual improvement in both eyes was reported, and thus Dr. Gealy recommended scleral-sutured IOL placement in both eyes. *Id.* at 6. |
| Dec. 2023 | Plaintiff underwent IOL surgery. Dkt. 89-1 at 5. |
| 2024 | Plaintiff was examined by a glaucoma specialist. Dkt. 89-1 at 3. |
| Current | Plaintiff is "on maximum medical therapy for glaucoma, with his pressure well controlled at 12," and "with a significant improvement in his vision in the right eye from 20/400 to 20/100." Dkt. 93-2 at 6. |

Upon this record, Plaintiff cannot proceed against Centurion because he has not provided factual allegations showing any delay in eyecare treatment resulted from a Centurion policy or practice. There are insufficient facts to show that, between May 2021, when Dr. Grange recommended a follow-up corrective surgery, and January 2022, when Dr. Simpson performed the surgery, a Centurion policy caused delay in scheduling the surgery, as opposed to (1) the inherent delay resulting from the overall change from Corizon as the prison health care provider to Centurion in October 2021, (2) the potential negligence of one or more Corizon or Centurion employees, or (3) the difficulty of scheduling outside medical specialists to treat out-of-state prisoners, because many private officers are unequipped or unwilling to treat prisoners.

Similarly, Plaintiff has not identified particular persons at Centurion who were deliberately indifferent to his eye care. Plaintiff's chronology of eye care shows that

medical and prison personnel were consistently responsive to his requests to follow-up on the recommended surgery. Plaintiff has not provided facts showing that any particular Centurion employees were deliberately indifferent, which in turn was the cause for the delayed surgery. The record reflects only possible negligence, which is not a federal claim. This case is now four years old, Centurion began providing prison medical care in October 2021, and if Plaintiff had grounds to show that a particular Centurion employee was deliberately indifferent to his eye care, he could have produced that evidence already.

Again addressing the "emergency" prioritization issue, Plaintiff asserts it was deliberately indifferent for Centurion staff to fail to mark his condition as "emergent intervention" on their internal forms. It is clear that the forms triage medical conditions needing ambulance transport different from follow-up care such as his. Dkt. 78-2 at 29. Dr. Grange did not consider the follow-up surgery an emergency, and requested only that it be done as soon as possible. When Plaintiff's conditions posed an emergency—both times the prison optometrist suspected a detached retina—Plaintiff *was* rushed to the hospital emergency room and then to a retinal specialist.

Although Plaintiff may have been able to show he had some temporary pain and diminished eyesight for nine months, he has not shown who was responsible for the scheduling delay, why the scheduling was delayed, or that any Centurion employee acted with deliberate indifference, as opposed to mere negligence. As to alleged permanent damage, Plaintiff's assertion that he should be permitted to proceed by amendment at this late date because his "vision abilities completely evaporated, which is [his] current state of vision," *see* Dkt. 86 at 2, is unsupported by the record.

Plaintiff also blames Centurion administrative staff, who "manipulated their records and response in their attempt to derail Plaintiff from exhausting the grievance process," for his failure to exhaust administrative remedies required to file a lawsuit. Dkt. 86 at 2. However, the law governing exhaustion provides that exhaustion is excused if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016). Further, Plaintiff appears to have completed the grievance and appeal process regarding his eye issues twice. *See* Dkt. 78-4 at 25-28. Plaintiff's alleged inability to exhaust his administrative remedies against the proposed defendants is not an adequate excuse to excuse the lateness of his decision to attempt to pursue claims against them. Plaintiff was not diligent in attempting to file an amendment before the deadline. For these reasons, and those set forth in the challenged Order, Plaintiff's Motion for Reconsideration will be denied.

## ORDER

**IT IS ORDERED:**

1. The remainder of the Motion for Summary Judgment of Dr. Landon Grange (Dkt. 64) is GRANTED. This entire case will be DISMISSED with prejudice.
2. Plaintiff's Motion to Set Aside and/or Reconsider the September 22, 2025, Memorandum Decision (Dkt. 86) is DENIED.
3. Plaintiff's Motion for Leave to Subpoena New Non-Parties (Dkt. 89) is DENIED.

4. Plaintiff's Motions for Extension of Time to File Sur-Reply (Dkts. 98, 99) are GRANTED.

DATED: September 30, 2026

David C. Nye
U.S. District Court Judge